IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| DIVERSE MEDICAL MANAGEMENT, INC., AZZAM MEDICAL SERVICES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> PLATINUM GROUP USA, INC., <br><br> THE THIRD FRIDAY TOTAL RETURN FUND, L.P., and <br><br> AMERICORE HEALTH, LLC, <br><br> Defendants. | Case No: <br> JURY DEMAND |

## COMPLAINT

Plaintiffs Diverse Medical Management, Inc. and Azzam Medical Services, LLC, by and through their undersigned counsel, for its Complaint against Platinum Group USA, Inc., The Third Friday Total Return Fund, L.P., and Americore Health, LLC, (collectively "Defendants") allege as follows:

### THE PARTIES

1. Diverse Medical Management, Inc. ("DMM") is a Tennessee corporation organized and existing under the laws of Tennessee with its principal place of business in McMinnville, Tennessee.

2. Azzam Medical Services, LLC is an Alabama limited liability company with its principal place of business in Hoover, Alabama.

3. Platinum Group USA, Inc. ("Platinum Group") is a corporation organized and existing under the laws of Florida with its principal place of business in Delray Beach, Florida.

4. The Third Friday Total Return Fund, L.P. ("Third Friday Fund") is a limited partnership organized and existing under the laws of Delaware with its principal place of business in Delray Beach, Florida.

5. Americore Health, LLC ("Americore") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Lauderdale By the Sea, Florida.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the causes of action set forth in this Complaint pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between DMM and the Defendants and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.

7. This Court has personal jurisdiction over the Defendants due to Defendants' purposeful availment to the privilege of acting in Tennessee and intentionally causing the consequences described below. Defendants' proactively communicated with DMM in Tennessee in furtherance of their fraudulent schemes for more than one year, and these communications form the heart of DMM's claims. Over this time, Defendants profited financially from their ongoing fraud, as detailed below.

8. Venue is proper pursuant to 28 U.S.C. §§ 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

9. DMM is an innovative leader in the field of behavioral health, with a special focus on the needs of rural hospitals and providers.

10. DMM's success and specialization has attracted the attention of numerous investors over the years, including that of Defendants.

**Defendants' Fraudulent Behavior**

11. On December 19, 2017, DMM's President and CEO traveled to Fort Lauderdale, Florida, to meet with Americore and discuss a potential partnership with DMM. At this meeting, it was decided that DMM would provide business development and management services to hospitals that Americore intended to acquire.

12. Americore and DMM had a series of meetings in the first half of 2018. These meetings culminated in a May 2018 meeting between DMM and Americore, with lawyers present, in which the parties discussed Americore's acquisition of DMM.

13. Shortly after this meeting, however, DMM grew disillusioned with Americore and, most importantly, Americore's leadership and point person DMM was dealing with. Specifically, after Americore missed initial agreed-upon payments for DMM's overhead, it became apparent that Americore was unable to execute an acquisition of DMM. But this was only the beginning of Defendants' fraudulent behavior.

14. It was not until DMM grew disillusioned with Americore and its leadership that Platinum Group and Third Friday Fund (the "Investor Defendants")—in addition to their respective leadership teams—entered the fray and continued the fraudulent scheme and made additional fraudulent promises.

15. In June 2018, DMM leadership called an acquaintance of Americore's leadership team to determine whether DMM had to sever all ties with Americore. DMM was informed that it should not speak with Americore and its leadership team, but instead should deal exclusively

with the Investor Defendants and their respective agents going forward, who would ensure that DMM's model would find its way into Americore hospitals, where it would thrive.

16. Beginning in July 2018, Third Friday Fund started promising DMM that a large infusion of cash was going to be available through the Platinum Group.

17. From July 2018 to the present, countless emails and text messages were sent by the Investor Defendants' leadership to DMM promising this infusion of cash, instructing DMM to acquire complimentary businesses, and explore new service lines, among other instructions. In other words, the Investor Defendants were explicitly instructing DMM to extend itself and grow beyond its core business model with the express promise that the imminent—and certain—investment would cover the growth.

18. In August 2018, for example, Third Friday Fund's leadership attended a summit in Dallas to discuss DMM's future. At this meeting, it was agreed that there would be a $10 million cash infusion dispersed in the following way: 1) $3.5 million for the purchase of DMM stock and loan repayment; 2) $3 million for the acquisition of Azzam Medical Services; and 3) $3.5 million for operational capital and repayment of DMM overhead. The $3.5 million for operational capital and repayment of DMM overhead represented a series of loans to DMM by Third Friday Fund, which ultimately totaled $596,100 and later proved to be nothing more than a series of fraudulent inducements to drag the process out and allow Defendants to steal DMM's business model.

19. At the Dallas meeting, DMM was promised that the deal would close on September 25, 2018.

20. In the weeks leading up to September 25, 2018, DMM was repeatedly promised by the Investor Defendants that it would be celebrating a new venture. On September 4-5, 2018,

DMM leadership dined with a Platinum Group representative. At this dinner, the Platinum Group representative repeatedly stated that funding was being wrapped up for September 25.

21. On September 25, 2018, DMM's leadership team traveled to West Palm Beach, Florida, as planned, and met with the Investor Defendants. But Investor Defendants informed DMM that they did not have the money, but should expect to meet in New York City to sign for the money as early as the next week.

22. In October, November, and December 2018, DMM and its leadership was inundated with phone calls, text messages, and emails providing constant updates from the Investor Defendants on the ever-imminent funding.

23. On October 9, 2018, Third Friday Fund's founder texted DMM's President and CEO: "Got an update on funding. Told we should have all the documents bank needs by end of the week. Our people are working hard to get this done ASAP."

24. On December 12, 2018, Third Friday Fund's founder emailed DMM's President and CEO yet again:

> We are working 24/7 to get this deal closed ASAP. I apologize for this taking so long. I promise we will get it done and that it will be worth the wait. . . . [T]he future is going to be great and if there is anything I can do please don't hesitate to call 24/7. I believe in you and Natalie and am proof [proud] to be working with you and I speak for [Platinum Group] as well.

25. The Investor Defendants' illusory promises continued into the new year. On January 23, 2019, after DMM sought greater clarity regarding the status of the investment, Third Friday Fund's founder explained: "Ok put Feb 15 just to give us enough time to move money etc and do all the legal work but we should get it done before then."

26. On January 31, 2019, Third Friday Fund informed DMM's President and CEO that a foreign investor "approved the investment and we are working on the term sheet."

27. On February 20, 2019, Third Friday Fund repeated the same message about the same foreign investor: "[It] approved the deal and is just doing final stuff needed bc it is a public company. I will get final details hopefully today from Amer." And two hours later: "Quick update. [The investor] is good to go."

28. This was also affecting DMM's related entity, Azzam Medical Services, which was led by DMM's Chief Medical Director, because his venture was not being funded or acquired. When DMM raised these concerns on February 28, 2019, Third Friday Fund responded: "[T]ell [Azzam Medical Services] I guarantee payment".

29. The Investor Defendants' stalling dragged into March. On March 25, 2019, DMM inquired about the status of the still-unfunded venture. Third Friday Fund responded: "Nothing has changed," but then supplemented his response on March 26, 2019: "Actually things have changed. We have multiple companies that want to do the deal now!!!"

30. By April 2018, the Investor Defendants' ongoing fraud had become apparent. Specifically, the Investor Defendants' leadership and agents began communicating with DMM's current investors and promising the current investors that they would be repaid within the week. One such call occurred on April 8, 2019. When the week came to pass, it became clear to DMM and its investors that the Investor Defendants had no interest in investing, but instead were executing a fraudulent scheme on DMM.

31. Shortly thereafter, DMM's general counsel called Platinum Group's counsel to get to the bottom of the investments. Platinum Group's outside counsel was entirely unaware of the promised investments made by his client. This eliminated any remaining doubt at DMM about the Investor Defendants' fraudulent scheme.

### Unsecured Loan Agreements

32. After the Investor Defendants made their first fraudulent misrepresentations, and as they continued to make further fraudulent misrepresentations, Third Friday Fund was also entering into Unsecured Loan Agreements with DMM. These loans were made to cover working capital and payroll for DMM until the Investor Defendants made the repeatedly promised investment.

33. In total, ten (10) loans were made to DMM by Third Friday Fund from July 30, 2018, to December 20, 2018, all explicitly premised on defendants' fraudulent promises that part of the investment in DMM would be used to repay these loans in full.

### DAMAGES

34. While the Defendants were making these promises, DMM was implementing its model in rural hospitals and providers operated by Americore in reliance on these promises. What's more, the Defendants were learning more and more about DMM's business model and what made it so successful.

35. DMM was also taking on additional responsibility and service lines at this time through the acquisition of complementary businesses and entities. DMM was doing so not only based on the Investor Defendants' promises of funding, but at their specific request and encouragement. This has resulted in DMM assuming significant financial obligations, primarily in the shape of numerous medical providers needing to be paid. But without the promised investment, DMM can only make payroll for a very limited time.

36. Finally, the Defendants' fraud and inability to invest thwarted potential business deals for DMM and directly caused other entities that were scheduled to roll into DMM to go insolvent.

## CLAIMS FOR RELIEF

### Count I – Common Law Fraud Against All Defendants

37. DMM incorporates the allegations set forth in Paragraphs 1-36 by reference.

38. Defendants intentionally misrepresented multiple material facts and produced false impressions on the part of DMM in order to mislead DMM and obtain an undue advantage over it in the marketplace.

39. Defendants made the repeated representations, including but not limited to their repeated promises that funding was nearly secured and that DMM should acquire complimentary businesses on promises of future reimbursement, with knowledge of their falsity and with a fraudulent intent.

40. Defendants' representations, outlined above, were made with respect to material and existing facts related to DMM's business.

41. DMM reasonably relied upon those repeated misrepresentations by both conducting its business in accord with these repeated misrepresentations and forgoing other funding opportunities for more than a year.

### Count II – Promissory Fraud Against All Defendants

42. DMM incorporates the allegations set forth in Paragraphs 1-41 by reference.

43. Defendants intentionally and repeatedly misrepresented material facts, while producing false impressions on the part of DMM, in to order mislead DMM and obtain an undue advantage over it in the marketplace.

44. Repeated representations, including but not limited to Defendants' repeated promises that an acquisition was imminent, investment funding was nearly secured, and that DMM should acquire complimentary businesses on promises of future reimbursement, were made by

Americore and the Investor Defendants with knowledge of their falsity and with a fraudulent intent.

45. DMM reasonably relied upon those repeated misrepresentations by both conducting its business in accord with these repeated misrepresentations and forgoing other funding opportunities for more than a year.

46. Defendants repeated statements embodied promises of future action despite having no present intention to carry out the promise.

### Count III – Declaratory Judgment Against Third Friday Fund

47. DMM incorporates the allegations set forth in Paragraphs 1-46 by reference.

48. DMM entered into ten (10) unsecured loan agreements with Third Friday Fund, dating from July 30, 2018 to December 20, 2018.

49. DMM entered into these agreements in reliance on the Investor Defendants' repeated promises that investment was imminent and that these loans were intended to maintain DMM's status quo until said investment was finalized.

50. As a result of the ongoing fraud outlined above, DMM seeks a declaration under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, that the unsecured loan agreements are invalid because they were procured fraudulently.

### Count IV – Civil Conspiracy Against All Defendants

51. DMM incorporates the allegations set forth in Paragraphs 1-50 by reference.

52. Defendants, and each of them, had a common design to steal DMM's business model.

53. Defendants acted in concert to steal DMM's business model, which is an unlawful purpose. Specifically, Defendants stole DMM's business model and implemented the model at Ellwood City Medical Center, in Ellwood City, Pennsylvania.

54. Defendants' fraudulent promises to DMM were unlawful means.

55. DMM was damaged as a result of Defendants' civil conspiracy, in an amount to be determined at trial.

**WHEREFORE,** Plaintiff demands the following relief:

1. That the Court award Plaintiff compensatory damages in an amount to be established at trial;

2. That the Court award Plaintiff punitive damages in an amount to be established at trial;

3. That the Court award Plaintiff the attorneys' fees and costs it incurs in this action;

4. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Robert A. Peal
Robert A. Peal
Mark W. Lenihan
SIMS|FUNK, PLC
3322 West End Avenue, Suite #200
Nashville, TN 37203
(615) 292-9335
rpeal@simsfunk.com
mlenihan@simsfunk.com

*Counsel for Plaintiffs*