**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **DIVERSE MEDICAL** | ) | |
| **MANAGEMENT, INC.; AND AZZAM** | ) | |
| **MEDICAL SERVICES, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No: 19-CV-00046** |
| | ) | **JURY DEMAND** |
| **PLATINUM GROUP USA, INC.;** | ) | |
| **AMER RUSTOM; THE THIRD** | ) | |
| **FRIDAY TOTAL RETURN FUND, L.P.;** | ) | |
| **MICHAEL LEWITT; AMERICORE** | ) | |
| **HEALTH, LLC; GRANT WHITE; AND** | ) | |
| **JAMES B. BIDEN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## FIRST AMENDED COMPLAINT

---

Plaintiffs Diverse Medical Management, Inc. ("DMM") and Azzam Medical Services, LLC ("AMS"), by and through their undersigned counsel, for their Complaint against Platinum Group USA, Inc., Amer Rustom, The Third Friday Total Return Fund, L.P., Michael Lewitt, Americore Health, LLC, Grant White, and James B. Biden (collectively "Defendants") allege as follows:

### INTRODUCTION

Rural Americans are facing a healthcare crisis. Plaintiffs developed an innovative healthcare delivery model, with rural hospitals and clinics at its center, that provides high-quality and affordable healthcare to these at-risk and frequently neglected citizens. This model attracted significant interest from investors, including the Defendants, that could have launched Plaintiffs' healthcare model into rural communities throughout the country. Unfortunately, Plaintiffs

innovative approach never reached its potential. Instead, the Defendants concocted a scheme to defraud the Plaintiffs and undercut their promising healthcare model, also depriving rural Americans in the process.

In December 2017, Defendant Americore Health, LLC ("Americore") and its CEO, Defendant Grant White ("White"), a rural hospital operator, expressed an interest in partnering with Plaintiffs. Americore was purportedly in the business of acquiring and turning around struggling rural hospitals. At the outset, Americore and White touted the potential success of implementing Plaintiffs' model in Americore's rural hospitals. As talks progressed, in May 2018, the parties agreed to Americore's acquisition of Plaintiffs. But the deal never closed, despite Grant's promises to the contrary.

As its relationship with Americore[1] deteriorated, DMM turned to one of Americore's principals: Defendant James Biden ("Biden"). In June 2018, Biden introduced DMM's founder and CEO, Michael Frey ("Frey"), to Biden associate Defendant Michael Lewitt ("Lewitt")—an Americore investor and money manager—to discuss Plaintiffs' model. Lewitt and Biden together then put Plaintiffs in touch with Defendant Platinum Group USA, Inc. ("the Platinum Group") and Defendant Amer Rustom ("Rustom"), who they promised would assist Plaintiffs in securing investments from third-party investor sources.

---

[1] Presently, upon information and belief, Americore hospitals and its leadership are under criminal investigation and face a slew of lawsuits including a class action lawsuit brought by its own employees. *See* Ayla Ellison, *Pennsylvania Hospital, 3 Execs Tied to Criminal Probe*, Becker's Hospital Review (January 22, 2019), https://www.beckershospital review.com/legal-regulatory-issues/pennsylvania-hospital-3-execs-tied-to-criminal-probe.html; Channel 11 News, *DA Launches Investigation into Ellwood City Hospital That Suspended Employees' Pay*, (January 22, 2019), https://www.wpxi.com/news/top-stories/da-launches-investigation-into-ellwood-city-hospital-that-suspended-employees-pay/908306491; Ayla Ellison, *Kentucky Hospital Faces Class Action After Workers' Health Plan Canceled*, Becker's Hospital Review (June 24, 2019), https://www.beckershospitalreview.com/finance/ kentucky-hospital-faces-class-action-after-workers-health-plan-canceled.html.

What followed was a classic fraudulent bait-and-switch. For roughly nine months, Biden, Lewitt, Rustom, and their respective companies (the "Investor Defendants") made promise after promise to Plaintiffs. Whether it was through in-person meetings, phone calls, text messages, or emails, the Investor Defendants furthered their fraudulent scheme one communication at a time. The Investor Defendants instructed Plaintiffs to acquire new businesses and service lines because investment capital was just around the corner. They repeatedly assured Plaintiffs that investment capital originating from and flowing through foreign entities was not only certain, but was imminent. And Biden promised the Plaintiffs that their Intensive Outpatient Model ("IOP") would play an integral role in healthcare policy at the highest levels of the United States government.

But it was all a fraud. Defendants' fraudulent scheme had two primary goals: (1) in the short-term, stealing Plaintiffs' business model; and (2) stringing Plaintiffs along in order to drive DMM and AMS into insolvency, with Defendants' ultimate objective being the dilution and control of Plaintiffs' businesses. With each empty promise and passing week, Defendants misappropriated Plaintiffs' business model, piece-by-piece, while at the same time directing Plaintiffs to take on increasing obligations. Eventually, it became clear to Plaintiffs that the repeatedly-promised investment capital was never coming. By then, however, at the express directions of Defendants, Plaintiffs had acquired multiple service lines, assumed various payroll liabilities, missed a number of lucrative contractual opportunities, entered into numerous loan agreements to stay afloat, and had their business model ripped away from them with nothing to show for any of it. Thus, Plaintiffs were left with no choice but to bring this lawsuit.

## THE PARTIES

1.     Diverse Medical Management, Inc. ("DMM") is a Tennessee corporation organized and existing under the laws of Tennessee with its principal place of business in McMinnville, Tennessee.

2.     Azzam Medical Services, LLC ("AMS") is an Alabama limited liability company with its principal place of business in Hoover, Alabama.

3.     Platinum Group USA, Inc. ("The Platinum Group") is a corporation organized and existing under the laws of Florida with its principal place of business in Delray Beach, Florida. The Platinum Group provides business development and consulting services for businesses on an international scale.[2]

4.     Amer Rustom ("Rustom") is an adult resident of Florida and serves as the CEO and President of The Platinum Group.  Rustom is a successful entrepreneur and international investor and is Platinum Group's co-founder.  Rustom also serves as President, Chief Executive Officer, and Chairman of Platinum Petroleum International Limited, an oil company focusing on extraction in the Middle East.  Rustom claims to have "successfully developed strong ties with many of the Middle East and North African leaders and country officials as well as the local and international business communities."[3]

5.     The Third Friday Total Return Fund, L.P. ("Third Friday Fund") is a limited partnership organized and existing under the laws of Delaware with its principal place of business in Delray Beach, Florida. Third Friday Fund is a hedge fund touted as "one of the best performing hedge funds on a risk-adjusted basis."[4] Upon information and belief, the total assets of the Third Friday Fund exceed $50 million.

---

[2] *Id.*

[3] The Platinum Group USA, *About Us*, http://www.tpgus.com/about (last visited July 18, 2019).

[4] Opalesque TV, *Third Friday Total Return Fund, One of the Best Performing Hedge Funds on a Risk-Adjusted Basis, Gets Institutional Traction* (February 12, 2016), http://www.opalesque.tv/hedge-fund-videos/michael-lewitt/1.

6.      Michael Lewitt ("Lewitt") is an adult resident of Florida, is a member of Third Friday GP, LLC, the General Partner of the Third Friday Fund, and manages the Third Friday Fund.  Lewitt is a licensed attorney and elite investor with over 30 years of securities industry and investment management experience.  He has been a frequent contributor to Forbes magazine[5] and the New York Times,[6] has appeared on CNBC,[7] and has been quoted by news organizations including CNN,[8] the Washington Post,[9] and FoxNews.[10]

7.      Americore Health, LLC ("Americore") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Lauderdale By the Sea, Florida.

---

[5] Forbes, *Contributor: Michael Lewitt*, https://www.forbes.com/sites/michaellewitt/#34c13640720a (last visited July 18, 2019).

[6] Michael Lewitt, *Wall Street's Next Big Problem*, N.Y. TIMES (September 15, 2008), https://www.nytimes.com/2008/09/16/opinion/16lewitt.html.

[7] Lee Brodie, *Mega-Bear Prediction: Dow 5,000*, CNBC (December 24, 2008), https://www.cnbc.com/id/28379766.

[8] Katie Benner, *Madoff Mess Exposes Fund Ripoffs Too*, CNN MONEY (December 16, 2008), https://money.cnn.com/2008/12/16/news/companies/madoff_fundoffunds.fortune/index.htm.

[9] Matt Miller, *Barack Obama, Private Equity King*, WASHINGTON POST (May 23, 2012), https://www.washingtonpost.com/opinions/barack-obama-private-equity-king/2012/05/23/gJQAFoILkU_story.html.

[10] Associated Press, *Experts Worry About "Smoke and Mirrors" in Earnings Reports as Stocks Hit Record after Record*, FOXNEWS (June 8, 2015), https://www.foxnews.com/us/experts-worry-about-smoke-and-mirrors-in-earnings-reports-as-stocks-hit-record-after-record.

8.    Grant White ("White") is an adult resident of Florida and is the Founder and CEO of Americore.  White is a self-described "investment banker and entrepreneur with experience in oil, gas, mining and widgets."[11]

9.    James B. Biden ("Biden") is an adult resident of Pennsylvania and is a Principal of Americore. Biden is an investor and businessman with "40 years of experience dealing with principals in business, political, legal and financial circles across the nation and internationally."[12]

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the causes of action set forth in this Complaint pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between DMM and the Defendants and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.

11.    This Court has personal jurisdiction over the Defendants due to Defendants' purposeful availment of the privilege of acting in Tennessee and intentionally causing the consequences described below.   Defendants proactively communicated with Plaintiffs in Tennessee in furtherance of their fraudulent schemes for more than one year.   These communications were sent to Tennessee, targeted Tennessee residents, and form the heart of DMM's claims.  Over the relevant time period, Defendants profited financially from their ongoing fraud, as detailed below.

---

[11] Amie Windsor, *Florida Startup Aims to Buy Sonoma West Medical Center*, SONOMA WEST TIMES & NEWS (February 16, 2017),
http://www.sonomawest.com/sonoma_west_times_and_news/news/florida-startup-aims-to-buy-sonoma-west-medical-center/article_53c30c76-f49d-11e6-b26c-fb466bc419fd.html.

[12] Charlie Gasparino, *The Ties that Biden*, FOX BUSINESS (October 22, 2012),
https://www.foxbusiness.com/politics/the-ties-that-biden.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

13.     Plaintiffs are innovative leaders in providing medical and psychiatric care in rural America.

14.     DMM is a husband-and-wife-owned medical management company based in McMinnville, Tennessee, and founded in 2014. DMM's owners live in a rural community and witness on a near-daily basis the acute problems rural citizens face seeking treatment for opioid addiction, mental health issues, veterans' issues, and sexual trauma. DMM's owners formed their company, in part, to seek a solution to these at-risk individuals in towns across America similar to those found in Warren County, Tennessee.

15.     AMS is a provider of medical services primarily to nursing homes. AMS was founded in 2014 in Hoover, Alabama, by Doctor Mohannad Azzam, M.D. ("Dr. Azzam"). Dr. Azzam has worked many years in the rural practice of medicine and has seen first-hand the problems patients face in these underserved communities.

16.     The rural hospital is at the center of Plaintiffs' business model and leverages the hospital's scale and capabilities to improve care beyond the walls of the hospital. This includes improved outcomes and efficiencies in senior care, veteran services (with a focus on PTSD), substance abuse treatment through its unique Intensive Outpatient Program ("IOP"), diabetes care, and behavioral and psychiatric care.

17.     DMM's success and specialization has attracted the attention of numerous investors over the years, including that of Defendants.

## Americore: The Fraud Begins

18.     On December 19, 2017, DMM's President and CEO, Michael Frey, and DMM's General Counsel, Mitchell Cohen, Esq., traveled to Fort Lauderdale, Florida, to meet with Americore and White.  The purpose of the meeting was to discuss a potential partnership between Plaintiffs and Americore.  At this meeting, it was decided that Plaintiffs would provide business development and management services to rural hospitals that Americore intended to acquire.  The first two hospitals were Pineville Community Hospital in Pineville, Kentucky, and Ellwood City Hospital in Ellwood City, Pennsylvania.

19.     In January 2018, Frey traveled to Pineville to introduce Plaintiffs' model to Pineville Hospital.  At this meeting, he met Biden for the first time.  Biden handed Frey a business card identifying him as a Principal with Americore.  (**Exhibit 1**, Biden Americore Card).

20.     Plaintiffs and Americore had a series of meetings in the first half of 2018.  During these meetings, the conversations between Plaintiffs and Americore transitioned from a management company tie to an acquisition by Americore of Plaintiffs' business.  These meetings culminated in a May 2018 meeting, with lawyers present, in which the parties discussed Americore's acquisition of DMM and AMS.  During the negotiations, Americore repeatedly represented that it had the funds necessary to acquire DMM and AMS.

21.     This acquisition was memorialized in a draft Term Sheet, which identified a closing date occurring on or before June 28, 2018.  The total purchase price was approximately $7 million, with payments structured over time.

22.     Shortly after this meeting, however, DMM grew disillusioned with Americore and White in particular.  For example, in early July of 2018, Americore missed initial agreed-upon payments for Plaintiffs' overhead and payroll, which Plaintiff AMS was forced to cover.  It became

apparent that, contrary to its representations, Americore was unable to execute the acquisition. But this was only the beginning of Defendants' fraudulent behavior.

23.     It was not until DMM grew disillusioned with Americore and its leadership that the Investor Defendants, who also possessed ownership and financial interests in Americore, entered the fray. At the time, Plaintiffs were thrilled to have the full attention of investors as respected and sophisticated as Biden, Lewitt, and Rustom.  Unfortunately, and unbeknownst to Plaintiffs, the Investor Defendants continued the fraudulent scheme, and made numerous additional fraudulent promises all with no present intention of keeping them.

### The Investor Defendants: Furthering the Fraudulent Scheme

24.     In June 2018, a friend of DMM's owners called Biden to ascertain Americore's intent to proceed with the proposed acquisition.  Biden instructed that Plaintiffs should no longer speak with Americore and White, but instead should deal exclusively with the Investor Defendants and their respective agents going forward, who would ensure that Plaintiffs' model would find its way into hospitals and thrive.  Through subsequent communications to Frey, the Investor Defendants made clear that the investment in Plaintiffs' businesses would not be through Americore, but instead come directly through them.

25.     Beginning in July 2018, the Investor Defendants promised Plaintiffs that a large infusion of cash to fuel the acquisition was going to be available through the Platinum Group.

26.     In August 2018, for example, Biden and Lewitt attended a summit in Dallas to discuss working with Plaintiffs.  At this meeting, it was agreed that there would be a $10 million cash infusion dispersed in the following manner: 1) $3.5 million for the purchase of DMM stock and loan repayment; 2) $3 million for the acquisition of AMS; and 3) $3.5 million for operational capital and repayment of DMM overhead loans.

27. The $3.5 million for operational capital and repayment of DMM overhead consisted of, in small part, a series of loans to DMM by Third Friday Fund, which ultimately totaled $434,000.00 to DMM. These loans later proved to be nothing more than a series of fraudulent inducements to drag the process out and allow Defendants to steal Plaintiffs' business model.

28. At this Dallas meeting, the Investor Defendants promised Plaintiffs that the deal would close on September 25, 2018.

29. On August 24, 2018, at the airport immediately after the summit, Lewitt sent Frey an email that copied Biden and his wife, Sara Biden, describing in detail the Investor Defendants' reasoning for cutting White and Americore out of the deal with Plaintiffs. (Lewitt Email of August 24, 2018, **Exhibit 2**.) In that email, Lewitt said:

> When I lay out all the facts of what has happened here I don't think there is any reason to wait or that Grant has any defense of any kind - the company has been effectively insolvent since at least May (probably earlier), he asked me make loans without disclosing the MCAs, the company has no functioning accounting system or financial controls, we are losing the confidence of our communities, etc etc. So we need to get him out now and get to work cleaning up the mess he created.

(*Id.*) Ominously, Lewitt also described his strategy should White resist:

> If he doesn't go quietly right away we will do what we have to do and we know how to do that. We should have a draft letter hopefully by end of business tomorrow for everyone to look at. What we need from Michael is an action plan to take over operations of the hospitals from Grant when we do that and effectively lock him out if we have to fight him. I also need the accounting firm to call me so I can get them set up to do a forensic accounting at the hospitals and holding company. If Grant does decide to fight, my plan will be to come at him very hard out of the box because putting him back on his heels will give us the advantage and we have much greater resources than him and like in any fight the guy who scores the first hard blow will have a huge advantage. Hopefully he will see the wisdom of going gently into the good night especially when we lay out the state of play.

(*Id.*)

30.     In the weeks leading up to September 25, 2018, the Investor Defendants repeatedly promised that Plaintiffs would be celebrating a new venture and would be receiving the substantial funding described above.  On September 4, 2018, Frey, his wife, and DMM's general counsel dined with Biden and his wife near their home in the Philadelphia, Pennsylvania area, and met with them at their home before and after dinner.  At this dinner, Biden and his wife, Sara Biden, repeatedly stated that funding would be wrapped up for September 25, 2018.  These statements were untrue in that Biden had no intention of obtaining funding.

31.     On September 25, 2018, in reliance on the Investor Defendants' representations, Plaintiffs traveled to West Palm Beach, Florida, as planned, and met with the Investor Defendants. The Investor Defendants informed the Plaintiffs that they did not have the money that day, but reassured the Plaintiffs that the investment would be finalized at a meeting as early as the next week in New York City.  The meeting never took place.

32.     In October, November, and December 2018, DMM, its leadership, and investors were inundated with phone calls, text messages, and emails in Tennessee providing constant updates from the Investor Defendants on the ever-imminent funding.  The communications contained in these phone calls, text messages, and emails were false in that Defendants had no intention of obtaining funding.

33.     On October 9, 2018, Lewitt texted Frey in Tennessee that he had "an update on funding" and that "we should have all the documents bank needs by end of the week.  Our people are working hard to get this done ASAP."  This statement was untrue in that Lewitt had no intention of obtaining funding.

34.     In November, 2018, however, an inadvertently-sent text message raised concern for Plaintiffs.  Biden accidentally texted Frey in Tennessee on November 5, 2018: "We can wrap

( A / C ) into Frey's entity *further diluting the both in the process? After we take control of both.* Just a thought. We must have complete control, too many moving pieces. Jim." (**Exhibit 3**, Biden November 5, 2018 Text Message) (emphasis added). After receiving this text message, Frey followed up with Biden but never received an explanation.

35.     At the time, Plaintiffs reasonably trusted the Investor Defendants, all of whom presented themselves as respected business leaders, with significant experience, large investment portfolios, and trustworthy records. Although Biden's text raised somewhat of a red flag with Plaintiffs initially, Biden and the other Investor Defendants continued to reassure Plaintiffs that the acquisition would still going to occur in accordance with the previously-discussed terms.

36.     On November 11, 2018, Biden left a voicemail for Dr. Mohannad Azzam, founder of AMS and Chief Medical Officer of DMM, pleading for a presentation on Plaintiffs' diabetes care model: "I need that material tonight for my meeting tomorrow." "I'm going to be with [investors]," Biden explained, "and I just wanted to have it with me. So if you can get it to me I'll have that letter for you, that contract for you by Friday *at the latest*, OK? *And uh, the funding, uh, to follow*." (emphasis added). AMS sent the requested information to Biden, but the letter, contract, and funding never followed.

37.     On December 12, 2018, Lewitt texted Frey in Tennessee yet again and removed any doubt that he spoke for Investor Defendants:

> We are working 24/7 to get this deal closed ASAP. I apologize for this taking so long. I promise we will get it done and that it will be worth the wait. . . . [T]he future is going to be great and if there is anything I can do please don't hesitate to call 24/7. I believe in you . . . and am proof [proud] to be working with you *and I speak for Amer and Skip and Jim as well*.

(emphasis added).

38.     On December 17, 2018, Lewitt sought additional information from Frey in Tennessee in order to secure funding from the Qatar Investment Authority: "Need the last info on

the hospitals so I can knock off the presentation. Doesn't have to be exact just rough estimates the I can get this in front of them asap. Just estimates of what the hospitals approved value is thanks. They are waiting for the package."

39.     Later that day, Lewitt confirmed receipt and shed additional light on the quality of information he was providing to the foreign investors, sending this communication to Frey in Tennessee: "Got it am reading the full article now on internet. Just make up some numbers throw darts it doesn't matter nobody is going to hold you to them they just have to see stuff look a certain way it's a Middle Eastern thing." (**Exhibit 4**, Lewitt December 17, 2018 Text Message).

40.     In short, Defendant Lewitt—who in the past has been registered as a broker-dealer with FINRA—was directing Frey to make false statements to potential investors, which, of course, he did not (and could not legally) do.

41.     On December 26, 2018, Platinum Group and DMM exchanged a draft Stock Purchase Agreement pursuant to which Platinum Group would acquire 60% DMM's stock for $3.5 million. Under the same Stock Purchase Agreement, Platinum Group was set to purchase Dr. Azzam's medical practice for an additional $3.5 million and pay DMM an additional $3 million "for general corporate purposes, including repayment of debt owed to The Third Friday Total Return Fund, L.P. and Americore Holdings, LLC." This transaction did not close. Defendants had no intention of ever closing on the transaction and instead used the exercise of exchanging drafts to string the Plaintiffs along.

42.     The Investor Defendants' illusory promises continued into the new year even as Plaintiffs grew concerned. On January 8, 2019, Biden texted Frey in Tennessee, claiming he was preparing to board a flight to Turkey to secure investment:

> I feel Very good. I will feel jubilant *when it I [sic] closed*. Please do not interpret this as anything but complete confidence. *It is going to happen.* We need

documentation which will take a few days. We are all in this together, total transparency. We are on our way. I will call you after our call. We have a plane 2/30 hrs. I will try to call before board the plane, if I can't, I will call the moment we land. Sleep well, it will happen. Jim

(emphasis added).

43.     On January 17, 2019, Rustom, Lewitt, Frey, and Dr. Azzam gathered for a series of business meetings in West Palm Beach and Nashville with Mr. Soner Gedik and Mer Vedat Mungan of Dogan Holdings—a Turkish investment group ("Dogan"), that was, according to the Investor Defendants, interested in investing in Plaintiffs. During his trip to Nashville, Lewitt informed a CEO at a struggling hospital in Manchester, Tennessee, that DMM was about to purchase 200 hospitals. This statement was false in that Lewitt knew he had no intention of ever providing funding.

44.     This trip to Nashville was memorialized in a January 17, 2019 agenda signed by Rustom and copying "His Excellency Jim Biden" and his wife "Her Excellency Sara Biden." The agenda conspicuously made no mention of DMM or AMS, but only identified Platinum Group.

45.     On January 23, 2019, Platinum Group, Rustom, and Biden submitted a White Paper to Dogan outlining "Platinum Group Diverse Medical Management (PGDMM)'s business model." What the investors were not told, however, was that this white paper was drafted by Plaintiffs and sent to Biden, Rustom, and Sara Biden; Platinum Group simply replaced all references to Plaintiffs with PGDMM, a non-existent entity. Neither Frey nor Dr. Azzam signed the white paper. Instead, it was submitted by Rustom, "His Excellency Jim Biden," and his wife "Her Excellency Sara Biden." Plaintiffs were not aware that the Investor Defendants had substituted PGDDM's name for Plaintiffs on the White Paper until after the fact.

46.     On January 23, 2019, after Frey sought greater clarity regarding the status of the investment, Lewitt explained in a text message to Frey in Tennessee: "Ok put Feb 15 just to give

us enough time to move money etc and do all the legal work but we should get it done before then."

47.     On January 31, 2019, Lewitt informed Frey via text message to Tennessee: "Just to be clear the Turks approved the investment and we are working on the term sheet." Lewitt further offered that "if any of your investors have questions I am happy to speak to them and I promise I will be nice." This statement was false in that the "Turks" had not approved the investment, and Lewitt had no intention of providing funding to Plaintiffs.

48.     On February 4, 2019, Rustom emailed Frey in Tennessee attaching a cash flow projection that claimed DMM would, after the promised investment, make $324 million in management revenue alone between the investment and the close of fiscal year 2023. (**Exhibit 5,** Rustom February 4, 2019 Email and Attachment.) Rustom knew that these numbers were fictional, in that Defendants had no intent to provide an investment.

49.     The fraud continued into February when Lewitt repeated this sentiment in a text message to Frey in Tennessee on February 11, 2019: "Quick update Dogan is good to go. As a public company they have some hoops to jump through that they are jumping through but they are telling us everything is a go."

50.     Then again, on February 20, 2019, Lewitt stated to Frey that the Dogan investment was "good to go. Dogan has approved the deal and is just doing final stuff needed bc it is a public company. I will get final details hopefully today from Amer." And two hours later: "Quick update. [The investor] is good to go."

51.     The next day, on February 21, 2019, Rustom spoke with Dr. Azzam and Frey regarding the forthcoming Turkish investment. Rustom communicated that the investment was

approved, and only awaited clearance by the International Organization of Securities Commissions, which would be completed within the next two weeks.

52.     Lewitt appeared to be playing every angle this entire time, which clearly took its toll on Lewitt.  On February 27, 2019, Lewitt informed Frey in Tennessee that he was "just trying to manage my stress which has hit my digestive system hard."  He continued to explain how he was waiting for Americore to close on St. Alexius Hospital in St. Louis and that he needed to "get $1.5 mm back from Grant and then I can breathe."  In light of Biden's warning to Plaintiffs to avoid Americore and Grant White, this was concerning but the Defendants' repeated promises, backed up by their backgrounds and impressive biographies allowed Plaintiffs to believe them. After Lewitt got his money from White, he explained, he could "then go to Turkey mid-March to close your deal and close our big fund raising and things change."

53.     Both Plaintiffs were negatively affected while the Investor Defendants conducted their fraudulent scheme.  Specifically, AMS, which was led by DMM's Chief Medical Director, was left in limbo because it was not being funded or acquired, even after Biden's November 2018 voicemail and promises.  Frey raised Azzam's concerns to Lewitt, who responded to Frey in Tennessee on February 28, 2019, that Frey should "tell [Azzam Medical Services] I guarantee payment."

54.     In mid-March of 2019, Defendants promised DMM that they were going to partner with Cliff Creek Builders to develop a new state-of-the-art rural health hospital in Paris, Texas, and that DMM would be contracted to provide management services for the new hospital. Defendants had no intention of developing the Paris hospital, and the opportunity never materialized.

55.     The Investor Defendants' stalling dragged into late March.  On March 25, 2019, Frey inquired about the status of the still-unfunded venture.  Lewitt initially responded in an attempt to maintain the status quo, "Nothing has changed."  Perhaps sensing that he needed to keep Plaintiffs at the table, Lewitt supplemented his response the very next day in order to further the fraud, sending a text to Frey in Tennessee that read: "Actually things have changed.  We have multiple companies that want to do the deal now!!!"

56.     By late March to early April 2019, the Investor Defendants' ongoing fraud had become apparent.   Specifically, the Investor Defendants' leadership and agents began communicating with Plaintiffs' current investors and promising the current investors that they would be repaid within two weeks.  For example, one such call occurred between Biden and Tennessee-based investor, Eric Burch, in March of 2019. (**Exhibit 6,** Burch Affidavit.).  During this conversation, Biden assured Mr. Burch that the funding for the acquisition of DMM was in place, and that the transaction would be completed no later than two weeks from the conversation. When the two weeks came to pass, it started to become clear to Plaintiffs and their investors that the Investor Defendants had no interest in investing, but instead were executing a fraudulent scheme.

57.     Shortly thereafter, DMM's general counsel called Platinum Group's outside transactional counsel, George Mesires, with representatives of Plaintiff and Defendant on the phone, to get to the bottom of the investment status.  It became apparent on the call that Mr. Mesires was unaware of the promised investments made by his client.  This eliminated any remaining doubt at DMM about the Investor Defendants' fraudulent scheme.

## The Investor Defendants Instruct Plaintiffs to Grow

58.     Plaintiffs were not merely waiting for an investment that never came.  They were taking actions to further their business development in reliance on the Defendants' fraud.  At the

same time that they were promising certain and imminent capital, Defendants repeatedly directed Plaintiffs to acquire various service lines, products, companies, hospitals, and the accompanying liabilities (such as payroll). The Investor Defendants explicitly instructed DMM to extend itself and grow beyond its core business model with the express promise that the imminent—and certain—investment would cover the growth. Again, Defendants' ultimate goal was to drive Plaintiffs' into insolvency so that Defendants could obtain control.

59. For example, on December 4, 2018, Lewitt told Frey in Tennessee that the Investor Defendants were "moving hard on raising our $$& [sic] from multiple places and they are all over us for more Healthcare we are asking them for $160 mm for you my brother *so go find some hospitals to buy.*" (emphasis added).

60. In late-December 2018, the Investor Defendants encouraged Plaintiffs to acquire a Middle Tennessee-based company called Geriatric Consulting Group ("GCG") and its sister company that handles management issues, Newcare. (*See* Miller Affidavit, **Exhibit 7.**) Specifically, Biden instructed Frey to make them a cash offer of $3.2 million to be paid out over a three-year period. While Frey was reluctant to make the offer, Biden stressed that the acquisition was essential in order to attract investment from abroad.

61. The investment never came, but Frey and DMM were left to assume the liabilities due as a result of the acquisition. Approximately four months after the acquisition, GCG's employees rolled into DMM and DMM became responsible for meeting payroll and paying overhead. In the immediate aftermath, the acquisition seemed impossible, and GCG even overdrew its account nearly $80,000. Over time, however, DMM has been able to incorporate GCG and Newcare into Unity Medical Center in Manchester, Tennessee, and the company is able to cover its own payroll and overhead, with great difficulty. The stress and harm done to Plaintiffs

and their reputations while attempting to right the ship, however, was significant.  Additionally, the acquisition price set by Biden remains unpaid, an obligation that Plaintiffs still owe.

62.     Throughout this time, Plaintiffs continually communicated with the Investor Defendants for reassurances that the promised investment capital was imminent, as Plaintiffs took on further obligations as directed by Defendants.  For example, on February 13, 2019 Frey explained to Lewitt that "[w]e have hundreds of contracted homes and four hospitals.  But we have to have the operating capital to bring on the help."

63.     On March 12, 2019, Frey spoke with GCG who expressed their displeasure with the situation.  Frey immediately relayed the conversation to Biden, and told Biden that DMM faced potential problems with Medicare and GCG if DMM were to have obtained GCG's employees without the capability to cover the expanded payroll.  Biden told Frey not to worry because funding was imminent.  This was false, and Biden knew it was false.

64.     Shortly after the call, Frey sent a text message to Lewitt bemoaning how bad a day he was having.  Lewitt responded via a text message to Frey in Tennessee that stated "Jim told me. Don't worry every time someone threatens to sue you you're with us now nobody is gonna touch you."  (**Exhibit 8,** Lewitt text of March 12, 2019.)  It was Frey's understanding that Lewitt was implying that DMM was "protected" because of Jim Biden's connections.

### Unsecured Loan Agreements

65.     After the Investor Defendants made their first fraudulent misrepresentations, and as they continued to make further fraudulent misrepresentations, Third Friday Fund was also entering into Unsecured Loan Agreements with DMM.  These loans were made to cover working capital and payroll for DMM until the Investor Defendants made the repeatedly promised investment.  These loan agreements were procured through fraud.

66. In total, ten (10) loans were made to DMM by Third Friday Fund from July 30, 2018, to December 20, 2018, all explicitly premised on Defendants' fraudulent promises that part of the investment in DMM would be used to repay these loans in full.

67. Of this series of loans, Third Friday wired $125,000 directly to Integrate Oral Health Care, $37,000 directly to Preventative Diagnostic Services, and the balance to DMM. Lewitt instructed DMM to sign loan agreements including the payments made to Integrate Oral Health Care and Preventative Diagnostic Services because (1) these companies would be subsidiaries of DMM once the promised funding arrived; (2) the repayment of the debt would come immediately out of the $100 million plus imminent investment; and (3) the investors in his fund required the paperwork.

68. As explained in Paragraph 39, *infra*, a draft Stock Purchase Agreement dated December 26, 2018 was drafted between Platinum Global Healthcare Partners, LLC and DMM under which Platinum Global Healthcare Partners, LLC would pay DMM $3 million "for general corporate purposes, including repayment of debt owed to The Third Friday Total Return Fund, L.P. and Americore Holdings, LLC."

69. On January 14, 2019, after the final loan had been made, Lewitt texted with Frey in Tennessee about how the loans would be repaid by the forthcoming investment and Stock Purchase Agreement. As the draft Stock Purchase Agreement was exchanged between the parties, Lewitt explained that he had to speak with his attorney regarding some "small nits" and asked Frey "were you contemplating the shareholders agreement addressing the $3 mm going into the company for General Corp purposes ***and debt payback***." (emphasis added).

70.     But the investment never came, the newly acquired companies' payrolls came due, and Plaintiffs were left on the hook for significant loan obligations procured by Third Friday Fund and Defendants' fraud.

71.     In fact, Third Friday Fund and Lewitt threatened to sue DMM despite their fraudulent behavior—forcing this lawsuit in the process.  On April 25, 2019, Lewitt, on behalf of the Third Friday Total Return Fund, sent a letter providing notice that all of the loans and obligations were "immediately due and payable."

72.     Strangely, this correspondence copied various attorneys at Faegre Baker Daniels, an international law firm, but was not actually sent by the attorneys.

73.     Regardless, it was clear that Lewitt believed he could bully DMM in complete disregard of his fraudulent behavior.  This brazen behavior left Plaintiffs with no choice but to bring this lawsuit.

## Litigation History

74.     Lewitt's bullying went beyond the Third Friday Fund loan agreements.  Whenever legal formalities and litigation were pressed upon him, he lashed out with threats and invective.

75.     For example, in November 2018, the parties were working to hammer out the terms of their partnership and acquisition.  Along those lines, DMM had outside transactional counsel in Tennessee create a Convertible Secured Promissory Note reflecting the terms and conditions agreed upon by all parties in the months leading up to its creation.

76.     But the formal Convertible Secured Promissory Note, drawn up by sophisticated outside counsel with significant experience in healthcare lending, clearly spooked Lewitt and the Investor Defendants.  In response, Lewitt (not his own outside counsel) shared a Stock Purchase Agreement that was inconsistent with the parties' negotiations to that point.

77. Outside counsel for DMM explained that "Your skeletal proposal set forth in the Stock Purchase Agreement does not reflect, in any way, the arrangement discussed at great length and agreed upon by the parties."

78. Perhaps sensing Lewitt's true character and fraudulent scheme, DMM's outside transactional counsel laid bare the Investor Defendants' fraudulent scheme:

> [O]n at least five separate occasions, Diverse has received assurances from you and Mr. Biden that edits to the proposed agreement were being completed and funding was imminent. So far, every funding date provided to Diverse was missed. Following your receipt of the Note, Diverse was reassured on numerous occasions that small changes would be made and a slightly revised version of the Note would be forthcoming. Diverse never received your promised edits to the Note. Rather, you provided to me a document that is a complete deviation from the agreed upon arrangement. Further, the content of the Stock Purchase Agreement you proposed gives me great pause as it is deficient in a number of ways and lacks numerous terms and conditions that we would expect to see in an agreement for a transaction of this size. In addition, a Stock Purchase Agreement would typically be accompanied by several other transaction documents, for example, Bylaws, Shareholder Agreement, and Employment Agreements none of which were provided or mentioned. These deficiencies raise questions in my mind regarding the sincerity of the proposal.

79. DMM's outside counsel further, and presciently, defined the early contours of the Investor Defendants fraud by explaining that DMM had been "diligently negotiating with potential customers in anticipation of the imminent funding that has been promised."

80. Outside counsel closed by explaining that "all future communications regarding this matter should be directed to me." She further stated that if Lewitt was represented by counsel she would to do the same.

81. Lewitt's response was unequivocal. He did not deny that promises were made related to investment or that promises were made that caused DMM to negotiate with customers. In fact, just the opposite. Lewitt *contested the insinuation that the promises were illusory*. Lewitt emailed both outside counsel and Frey in Tennessee (despite being told not to communicate with Frey directly), stating that he had "to add that the allegations regarding not providing funding etc

are false and we do not appreciate them."  Lewitt further lashed out at counsel that sensed his long con: "I know you are putting on a show for your client but this is a friendly deal and if you want it to continue to be a friendly deal you need to adopt the proper tone and drop the nonsense."

82.    The commencement of this current litigation revealed, once again, Lewitt's anger when confronted with relatively standard litigation procedure, but in a process where his and the Investor Defendants' fraud can be brought into the light.

83.    On June 28, 2019, Plaintiffs' counsel served litigation hold notices on each of the Defendants.

84.    The service of litigation holds is standard practice when there is a potential for litigation.  The American Bar Association includes templates on its website.  Litigation holds and the accompanying preservation are especially important in cases, such as this one, where documents and communications are central to the alleged facts and are susceptible to both automatic and manual deletion.

85.    Lewitt did not receive Plaintiffs' litigation hold notices well.  At 2:58 PM on June 28, 2019—six minutes after receiving Plaintiffs' litigation hold notice—Lewitt responded to the email: "We will [be] suing your clients next week both corporately and personally in view of your slanderous [sic] correspondence."  Lewitt, an attorney, inappropriately added Plaintiffs to this email.  The original service of the litigation hold notices only included Plaintiffs' counsel.

86.    Twelve minutes after that, Lewitt (a member of the bar) decided to threaten Dr. Azzam and Frey—and their wives—personally via text, stating:

> Since you are reaching out to me you should know that my fund is filing suit against your companies next week for failure to repay the loans I made to fund your payroll. Your lawyer's letter is defamatory and as a result of that letter I am now instructing my lawyers to sue each of you and your spouses individually as well.  If you think cage fighting is tough wait until you get in the legal ring with me. You are picking a wrong fight with that [sic] wrong guy.

(Lewitt text of June 28, 2019, **Exhibit 9**.)  Neither Frey nor Dr. Azzam responded to this threat.

87.     Unaware of this text message and in an attempt to defuse the situation (and with his clients now copied on the email), Plaintiffs' counsel responded to Lewitt's 2:58 PM email, stating simply: "I look forward to working with you."

88.     Unfortunately, Lewitt was not done protesting this standard litigation hold and continued to threaten Plaintiffs personally.  He sent yet another email, warning both Plaintiffs and counsel to "Be careful what you wish for.  You won't be working with me.  You and your clients will have the worst experience of their lives."

89.     Unprompted, and without any factual basis, Lewitt sent yet another email only two minutes later and copied his transactional attorney, George Mesires, based in Chicago: "I am instructing my attorney's [sic] to explore criminal charges as well against Diverse and the Frey's [sic] and Azzam."

90.     On Tuesday, July 2, 2019, Lewitt emailed Plaintiffs and their counsel unprompted once again.  Lewitt's email was nothing more than a thinly-veiled threat masquerading as an attempt to comply with the litigation hold notice:

> In reviewing and preserving documents as you requested, I came across an agreement dated 8/31/18 whereby Diverse and my fund purchased $125,000 of Stanous Flouride Rinse from Integrate Oral Care, LLC.  Can your client tell me what happened to the product and my fund's money?  Diverse was supposed to sell these goods and share 50% of the profits with my fund.

91.     Counsel for Plaintiffs politely requested that Lewitt "cease communications with my clients, as they are represented by counsel" and offered to communicate directly with Lewitt's outside counsel as well.

92.     Lewitt snapped back: "Just answer the question and stop the bullshit. I am an attorney and I am communicating with you. If your client can't handle dealing with this he shouldn't have stolen money from my fund."  Plaintiffs were, once again, included on this email.

## DAMAGES

93.     While the Defendants were making their series of fraudulent promises, Plaintiffs were implementing the model in rural hospitals and communities in reliance on these promises. What's more, the Defendants were learning more and more about Plaintiffs' business model and what made it so successful.

94.     Plaintiffs' were also taking on additional responsibility and service lines at this time through the planned and actual acquisition of complementary businesses and entities.  DMM was doing so not only based on the Defendants' promises of funding, but at their specific direction and encouragement, as illustrated above.  This has resulted in Plaintiffs assuming significant financial obligations, primarily in the shape of numerous medical providers needing to be paid.  But without the promised investment, Plaintiffs can only make payroll for a very limited time.

95.     Finally, the Defendants' fraud and inability to invest thwarted potential business deals and future business opportunities for Plaintiffs and directly caused other entities that were scheduled to roll into DMM and Azzam Medical Services to go insolvent.

## CLAIMS FOR RELIEF

### Count I – Common Law Fraud
**(Against All Defendants)**

96.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

97.     Defendants intentionally misrepresented multiple material facts and produced false impressions on the part of Plaintiffs in order to mislead them and obtain an undue advantage over them in the marketplace.

98.     Defendants made the repeated representations, including but not limited to their repeated promises that funding was certain and nearly secured and that Plaintiffs should acquire complimentary businesses on promises of future reimbursement, with knowledge of their falsity and with a fraudulent intent.

99.     Defendants' representations, outlined above, were made with respect to material and existing facts related to Plaintiffs' business.

100.    Plaintiffs reasonably relied upon those repeated misrepresentations by both conducting its business in accord with these repeated misrepresentations and forgoing other funding opportunities for more than a year.

101.    Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

## Count II – Promissory Fraud
### (Against All Defendants)

102.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

103.    Defendants intentionally and repeatedly misrepresented material facts, while producing false impressions on the part of Plaintiffs, in to order mislead Plaintiffs and obtain an undue advantage over it in the marketplace.

104.    Repeated representations, including but not limited to Defendants' repeated promises that an acquisition was imminent, investment funding was nearly secured, and that

Plaintiffs should acquire complimentary business lines on promises of future reimbursement, were made by Defendants with contemporaneous knowledge of their falsity and with a fraudulent intent.

106. Plaintiffs reasonably relied upon those repeated misrepresentations by both conducting its business in accord with these repeated misrepresentations and forgoing other funding opportunities for more than a year.

106. Defendants repeated statements embodied promises of future action despite having no present intention to carry out the promise.

107. Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

## Count III – Fraudulent Inducement
### (Against Third Friday Fund and Lewitt)

108. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

109. DMM entered into ten (10) unsecured loan agreements with Third Friday Fund, dating from July 30, 2018 to December 20, 2018.

110. As outlined above, Third Friday Fund and Lewitt made numerous false statements material to the loan agreements including, but not limited to, the repeated promises that the loans would be repaid with any forthcoming investment.

111. Third Friday Fund and Lewitt knew that these statements were false or, at a minimum, made them with an utter disregard for the truth of these statements.

112. Third Friday Fund and Lewitt also made these statements with the intent of inducing reliance on the statement by saddling DMM with debt while simultaneously furthering the fraudulent scheme carried out by the Defendants. Indeed, DMM did reasonable rely on these promises that the loan agreements would be repaid with investment funds.

113.    DMM has suffered an injury as a result of its reliance on Third Friday Fund and Lewitt's fraudulent promises in the amount of almost $600,000 in principal loaned to DMM to cover operations and entities that Plaintiffs were encouraged to acquire by Defendants and on the promise that investment would cancel out this debt.

114.    Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

## Count IV - Declaratory Judgment
### (Against Third Friday Fund)

115.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

116.    DMM entered into ten (10) unsecured loan agreements with Third Friday Fund, dating from July 30, 2018 to December 20, 2018.

117.    DMM entered into these agreements in reliance on the Investor Defendants' repeated promises that investment was imminent and that these loans were intended to maintain DMM's status quo until said investment was finalized.

118.    As a result of the ongoing fraud outlined above, DMM seeks a declaration under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, that the unsecured loan agreements are voidable because they were procured fraudulently.

## Count V – Civil Conspiracy
### (Against All Defendants)

119.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

120.    Defendants, and each of them, had a common design to steal Plaintiffs' business model and/or drive Plaintiffs into insolvency.

121.    Defendants acted in concert to steal Plaintiffs' business model, which is an unlawful purpose.  Specifically, Defendants stole Plaintiffs' business model and implemented the model at Ellwood City Medical Center, in Ellwood City, Pennsylvania and, upon information and belief, additional rural healthcare facilities.

122.    Defendants' fraudulent promises to DMM were unlawful means.

123.    Plaintiffs were damaged as a result of Defendants' civil conspiracy, in an amount to be determined at trial.

124.    Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

### Count VI – Tortious Interference with Business Relationships
**(Against All Defendants)**

125.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

126.    Plaintiffs had existing business relationship with specific third parties, including the hospitals and hospital systems they were considering acquiring.

127.    Plaintiffs had potential business relationships with other rural healthcare providers across the United States.

128.    Defendants' knew of Plaintiffs' existing and potential business relationships.

129.    Defendants intended to cause the termination or otherwise interfere of Plaintiffs' business relationships.

130.    Defendants used improper means, including making false promises to Plaintiffs and other misrepresentations regarding (later-discovered, nonexistent) impending funding for their business plan.

131.    Defendants had an improper motive; specifically, to drive Plaintiffs into insolvency and to misappropriate Plaintiffs' business model.

132.    Plaintiffs suffered damages in an amount to be determined at trial resulting from the Defendants' tortious interference with its business relationships.

133.    Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

<u>**Count VII – Promissory Estoppel/Detrimental Reliance**</u>
**(Against All Defendants)**

134.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

135.    As laid out above, Defendants made many different promises to Plaintiffs, including but not limited to the promises to fund Plaintiffs' innovative healthcare delivery model.

136.    Defendants' promises regarding providing funding were clear, specific, and unambiguous.

137.    Defendants should have reasonably expected their promises to induce action and/or forbearance on the part of Plaintiffs.

138.    Plaintiffs reasonably relied upon the promises of Defendants to their detriment.

139.    Plaintiffs suffered damages in an amount to be determined at trial as a result of their reasonable reliance on Defendants' unfulfilled promises.

<u>**Count VIII – Negligent Misrepresentation**</u>
**(Against All Defendants)**

140.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

141.    Defendants supplied information regarding their intent to provide funding and the assurance of definite and imminent funding to Plaintiffs.

142.    The information that Defendants supplied to Plaintiffs was false.

143.    Defendants did not exercise reasonable care in obtaining or communicating the information to Plaintiffs.

144.    Plaintiffs justifiably relied on the information that Defendants provided to them.

145.    Plaintiffs suffered damages in an amount to be determined at trial as a result of their justifiable reliance on Defendants' false representations.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs demands the following relief:

1.    That the Court award Plaintiffs compensatory, special, and consequential damages in an amount to be established at trial;

2.    That the Court award Plaintiffs punitive damages in an amount to be established at trial due to Defendants' intentional and outrageous conduct;

3.    That the Court award Plaintiffs their attorneys' fees and costs incurred in this action;

4.    For such other and further relief as the Court deems just and proper.


Respectfully submitted,

/s/ Robert A. Peal
Robert A. Peal
Mark W. Lenihan
SIMS|FUNK, PLC
3322 West End Avenue, Suite #200
Nashville, TN 37203
(615) 292-9335
rpeal@simsfunk.com
mlenihan@simsfunk.com

*Counsel for Plaintiffs*