IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| DIVERSE MEDICAL MANAGEMENT, INC.; ) | |
| AZZAM MEDICAL SERVICES, LLC, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Case No: 19-CV-00046 |
| ) | |
| PLATINUM GROUP USA, INC.; ) | |
| AMER RUSTOM; ) | |
| THE THIRD FRIDAY TOTAL RETURN FUND, L.P.; ) | |
| MICHAEL LEWITT; ) | |
| AMERICORE HEALTH, LLC; GRANT WHITE; AND ) | |
| JAMES B. BIDEN, ) | |
| ) | |
|     Defendants. ) | |
| _____ ) | |
| ) | |
| PLATINUM GROUP USA, INC.; ) | |
| THE THIRD FRIDAY TOTAL RETURN FUND., L.P., ) | |
| ) | |
|     Counterclaim Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DIVERSE MEDICAL MANAGEMENT, INC.; ) | |
| MICHAEL FREY; ) | |
| NATALIE FREY; AND ) | |
| MOHANNAD AZZAM, ) | |
| ) | |
|     Counterclaim Defendants. ) | |

**DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFFS'**
**FIRST AMENDED COMPLAINT AND COUNTERCLAIM PLAINTIFFS' COMPLAINT**
**AGAINST COUNTERCLAIM DEFENDANTS**

With the understanding that subject matter jurisdiction is at issue, and reserving all rights

with respect to Plaintiffs' pending motion to enjoin the lawsuit filed by Defendant Third Friday

Total Return Fund, L.P. ("Third Friday Fund") in Florida, Defendants Platinum Group USA, Inc.

("The Platinum Group USA"), Amer Rustom ("Rustom"), The Third Friday Fund, Michael Lewitt ("Lewitt"), and James B. Biden ("Biden") (collectively "Defendants"), by and through their attorneys, submit the following Answer and Defenses to the First Amended Complaint (the "Amended Complaint") filed by Plaintiffs Diverse Medical Management, Inc. ("DMM") and Azzam Medical Services, LLC ("AMS") (collectively "Plaintiffs"). Defendants The Platinum Group USA and Third Friday Fund also submit the following Counterclaim against DMM, Michael Frey ("Frey"), President and CEO of DMM, Natalie Frey, Executive Vice-President – Strategic Planning of DMM (collectively, the "Freys"), and Dr. Mohannad Azzam ("Azzam"), and state as follows:

## <u>GENERAL DENIAL</u>

Defendants deny each of the allegations in Plaintiffs' narrative "Introduction." As described in more detail below, there is no basis for Plaintiffs' unsupported allegations that Defendants concocted a fraudulent scheme, made any promises to Plaintiffs, or participated in any fraudulent activity whatsoever.

Plaintiffs sought out the expertise of the Defendants, certain of whom are experienced investors in the rural hospital industry, investing tens of millions of dollars in this important sector of the economy. Biden and his wife, Sara, have a long-held and passionate commitment to finding solutions for the improved treatment of both substance abuse and post-traumatic stress disorder ("PTSD") and the linkage between them, particularly in rural areas where so many local hospitals are failing. DMM appeared to offer an opportunity to invest in a business that provided important services to this sector.

Defendants entered into good faith negotiations with Plaintiffs for the potential acquisition of DMM, subject to satisfactory due diligence, definitive documentation, and financing, as is

customary in any transaction of this type. At the request of the Freys and Azzam, Third Friday Fund entered into contracts to provide DMM with loans in excess of $750,000 (the "Loan Agreements") to enable DMM to meet its payroll and other operational expenses while a possible transaction was considered. However, before any agreement was reached, much less a potential acquisition finalized, Defendants concluded that the Plaintiffs had: (i) overstated their operational successes to Defendants; (ii) failed to provide required and accurate financial due diligence information to Defendants; and (iii) concealed from Defendants that DMM had acquired two other health care companies that significantly inflated DMM's operating cost structure. Further, they were informed by Plaintiffs that DMM was "in an insolvent position, and in a very precarious and serious situation with Medicare." Because of these factors and others, Defendants stopped loaning money to Plaintiffs, terminated negotiations for the acquisition of the Plaintiffs, and took action to collect the over $750,000 in losses that Third Friday Fund suffered due to the Freys', Azzam's and DMM's wrongful conduct.

Plaintiffs' contention that the Defendants deliberately sought to drive DMM out of business is not only patently false, it defies logic. Defendants had nothing to gain from DMM's failure, and much to lose; namely, (i) the recovery of over $750,000 in loans that DMM has failed to repay, and (ii) an opportunity to invest in a company that it had initially sought to acquire.

# THE PARTIES

1.      Diverse Medical Management, Inc. ("DMM") is a Tennessee corporation organized and existing under the laws of Tennessee with its principal place of business in McMinnville, Tennessee.

**ANSWER**:      Upon information and belief, Defendants admit the allegations in

paragraph 1 of the Amended Complaint.

2.      Azzam Medical Services, LLC ("AMS") is an Alabama limited liability company with its principal place of business in Hoover, Alabama.

**ANSWER**:      Upon information and belief, Defendants admit the allegations in

paragraph 2 of the Amended Complaint.

3.      Platinum Group USA, Inc. ("The Platinum Group") is a corporation organized and existing under the laws of Florida with its principal place of business in Delray Beach, Florida. The Platinum Group provides business development and consulting services for businesses on an international scale.[1]

**ANSWER**:      Defendants admit the allegations in paragraph 3 of the Amended Complaint.

4.      Amer Rustom ("Rustom") is an adult resident of Florida and serves as the CEO and President of The Platinum Group USA. Rustom is a successful entrepreneur and international investor and is Platinum Group's co-founder. Rustom also serves as President, Chief Executive Officer, and Chairman of Platinum Petroleum International Limited, an oil company focusing on extraction in the Middle East. Rustom claims to have "successfully developed strong ties with many of the Middle East and North African leaders and country officials as well as the local and international business communities."

**ANSWER**:      Defendants admit that Rustom is an adult resident of Florida, serves as the

CEO and President of The Platinum Group USA, is The Platinum Group USA's co-founder, and

is President, Chief Executive Officer, and Chairman of Platinum Petroleum International Limited.

Defendants deny the remaining allegations in paragraph 4 of the Amended Complaint.

5.      The Third Friday Total Return Fund, L.P. ("Third Friday Fund") is a limited partnership organized and existing under the laws of Delaware with its principal place of business in Delray Beach, Florida. Third Friday Fund is a hedge fund touted as "one of the best performing

---

[1] Although Defendants reproduce the allegations of the Amended Complaint here for ease of reference, footnotes contained in the Amended Complaint are omitted.  Defendants aver that any statement made by any third party that is quoted in the Amended Complaint and cited in any footnote speaks for itself.

hedge funds on a risk-adjusted basis." Upon information and belief, the total assets of the Third Friday Fund exceed $50 million.

**ANSWER**: Defendants admit that Third Friday Fund is a limited partnership organized and existing under the laws of Delaware with its principal place of business in Delray Beach, Florida. Defendants deny the remaining allegations in paragraph 5 of the Amended Complaint.

6. Michael Lewitt ("Lewitt") is an adult resident of Florida, is a member of Third Friday GP, LLC, the General Partner of the Third Friday Fund, and manages the Third Friday Fund. Lewitt is a licensed attorney and elite investor with over 30 years of securities industry and investment management experience. He has been a frequent contributor to Forbes magazine and the New York Times, has appeared on CNBC, and has been quoted by news organizations including CNN, the Washington Post, and FoxNews.

**ANSWER**: Defendants admit the allegations in paragraph 6 of the Amended Complaint except that Defendants deny that Lewitt is a member of Third Friday GP, LLC or that he manages the Third Friday Fund.

7. Americore Health, LLC ("Americore") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Lauderdale By the Sea, Florida.

**ANSWER**: Upon information and belief, Defendants admit the allegations in paragraph 7 of the Amended Complaint.

8. Grant White ("White") is an adult resident of Florida and is the Founder and CEO of Americore. White is a self-described "investment banker and entrepreneur with experience in oil, gas, mining and widgets."

**ANSWER**: Upon information and belief, Defendants admit the allegations in paragraph 8 of the Amended Complaint.

9. James B. Biden ("Biden") is an adult resident of Pennsylvania and is a Principal of Americore. Biden is an investor and businessman with "40 years of experience dealing with principals in business, political, legal and financial circles across the nation and internationally."

**ANSWER**: Defendants admit that Biden is an adult resident of Pennsylvania and that he is an experienced investor and businessman. Defendants deny the remaining allegations in paragraph 9 of the Amended Complaint.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the causes of action set forth in this Complaint pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between DMM and the Defendants and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.

**ANSWER:**     Defendants admit that the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000. Defendants deny that there is complete diversity of citizenship between DMM and Defendants, as certain of Third Friday Fund's limited partners are citizens of Tennessee.

11.     This Court has personal jurisdiction over the Defendants due to Defendants' purposeful availment of the privilege of acting in Tennessee and intentionally causing the consequences described below. Defendants proactively communicated with Plaintiffs in Tennessee in furtherance of their fraudulent schemes for more than one year. These communications were sent to Tennessee, targeted Tennessee residents, and form the heart of DMM's claims. Over the relevant time period, Defendants profited financially from their ongoing fraud, as detailed below.

**ANSWER**:     Defendants admit that this Court has personal jurisdiction over the Defendants.  Defendants deny that they engaged in any fraudulent schemes, that they targeted Tennessee residents in any way, and that they profited financially in any way from the transactions described in the Complaint (and in fact suffered significant financial losses as a result of Plaintiffs' fraud) Defendants deny any wrongdoing or liability to Plaintiffs.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

**ANSWER**:     Defendants deny that venue is proper in this Court under 28 U.S.C. § 1391. Though some parts of the alleged events giving rise to the claims asserted in the Amended Complaint occurred in the Eastern District of Tennessee, most of the events occurred in the State of Florida and Plaintiffs and Defendants agreed in the Loan Agreements that the state and federal courts of Florida would be the venue for "[a]ll matters relating to [their] interpretation,

construction, validity and enforcement . . . ." Consistent with the forum selection clauses in the

Loan Agreements, on or about July 19, 2019, Third Friday Fund filed its Complaint for, among

other claims, breach of contract in the Circuit Court of the Fifteenth Judicial Circuit In and For

Palm Beach County, Florida ("Third Friday Fund Florida Loan Action"). Defendants deny they

engaged in any fraudulent or unlawful practices with regard to Plaintiffs and deny any liability to

Plaintiffs.

## FACTUAL BACKGROUND

13.     Plaintiffs are innovative leaders in providing medical and psychiatric care in rural America.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 13 of the Amended Complaint and therefore deny them.

14.     DMM is a husband-and-wife-owned medical management company based in McMinnville, Tennessee, and founded in 2014. DMM's owners live in a rural community and witness on a near-daily basis the acute problems rural citizens face seeking treatment for opioid addiction, mental health issues, veterans' issues, and sexual trauma. DMM's owners formed their company, in part, to seek a solution to these at-risk individuals in towns across America similar to those found in Warren County, Tennessee.

**ANSWER**:     Defendants deny that DMM is a husband-and-wife-owned medical

management company because DMM has at least five additional shareholders. Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 14 of the Amended Complaint and therefore deny them.

15.     AMS is a provider of medical services primarily to nursing homes. AMS was founded in 2014 in Hoover, Alabama, by Doctor Mohannad Azzam, M.D. ("Dr. Azzam"). Dr. Azzam has worked many years in the rural practice of medicine and has seen first-hand the problems patients face in these underserved communities.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 15 of the Amended Complaint and therefore deny them.

16. The rural hospital is at the center of Plaintiffs' business model and leverages the hospital's scale and capabilities to improve care beyond the walls of the hospital. This includes improved outcomes and efficiencies in senior care, veteran services (with a focus on PTSD), substance abuse treatment through its unique Intensive Outpatient Program ("IOP"), diabetes care, and behavioral and psychiatric care.

**ANSWER**:     Defendants deny that prior to negotiations with Defendants that Plaintiffs'

business model included services addressing veteran care, PTSD, and substance abuse. Only when

Plaintiffs learned of Defendants' interest in providing such services did Plaintiffs contend – in an

effort to embellish its operational experience – that DMM had expertise in providing veteran care,

PTSD, and substance abuse services. Defendants lack knowledge or information sufficient to form

a belief as to the truth of the remaining allegations in paragraph 16 of the Amended Complaint and

therefore deny them.

17. DMM's success and specialization has attracted the attention of numerous investors over the years, including that of Defendants.

**ANSWER**:     Defendants deny that DMM had any success or specialization that attracted

the attention of Defendants because Plaintiffs misrepresented to Defendants that their business was

successful when in fact it was not, as evidenced by, among other things, DMM's inability to meet

its payroll during the period between August 2018 and April 2019 without needing to seek loans

from Third Friday Fund and other sources. Defendants lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 17 of the Amended

Complaint and therefore deny them.

18. On December 19, 2017, DMM's President and CEO, Michael Frey, and DMM's General Counsel, Mitchell Cohen, Esq., traveled to Fort Lauderdale, Florida, to meet with Americore and White. The purpose of the meeting was to discuss a potential partnership between Plaintiffs and Americore. At this meeting, it was decided that Plaintiffs would provide business development and management services to rural hospitals that Americore intended to acquire. The first two hospitals were Pineville Community Hospital in Pineville, Kentucky, and Ellwood City Hospital in Ellwood City, Pennsylvania.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Amended Complaint and therefore deny them.

19.     In January 2018, Frey traveled to Pineville to introduce Plaintiffs' model to Pineville Hospital. At this meeting, he met Biden for the first time. Biden handed Frey a business card identifying him as a Principal with Americore. (**Exhibit 1**, Biden Americore Card).

**ANSWER**:     Defendants admit that Biden has met Frey, but Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Amended Complaint and therefore deny them. Defendants deny the inference that Biden had a financial interest in Americore.

20.     Plaintiffs and Americore had a series of meetings in the first half of 2018. During these meetings, the conversations between Plaintiffs and Americore transitioned from a management company tie to an acquisition by Americore of Plaintiffs' business. These meetings culminated in a May 2018 meeting, with lawyers present, in which the parties discussed Americore's acquisition of DMM and AMS. During the negotiations, Americore repeatedly represented that it had the funds necessary to acquire DMM and AMS.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Amended Complaint and therefore deny them.

21.     This acquisition was memorialized in a draft Term Sheet, which identified a closing date occurring on or before June 28, 2018. The total purchase price was approximately $7 million, with payments structured over time.

**ANSWER**:     Defendants deny that the draft Term Sheet memorialized an acquisition of DMM by Americore because by Plaintiffs' admission the Term Sheet was a draft and, by definition, was not a binding contract. Any transaction was subject to satisfactory due diligence, definitive documentation, and financing, none of which ever occurred. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 21 of the Amended Complaint and therefore deny them.

22.     Shortly after this meeting, however, DMM grew disillusioned with Americore and White in particular. For example, in early July of 2018, Americore missed initial agreed-upon payments for Plaintiffs' overhead and payroll, which Plaintiff AMS was forced to cover. It became

apparent that, contrary to its representations, Americore was unable to execute the acquisition. But this was only the beginning of Defendants' fraudulent behavior.

**ANSWER**:  Defendants deny that Americore agreed to any payments for Plaintiffs' overhead and payroll, or that Defendants engaged in any fraudulent behavior. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22 of the Amended Complaint and therefore deny them. Defendants deny any fraudulent behavior on their part.

23.  It was not until DMM grew disillusioned with Americore and its leadership that the Investor Defendants, who also possessed ownership and financial interests in Americore, entered the fray. At the time, Plaintiffs were thrilled to have the full attention of investors as respected and sophisticated as Biden, Lewitt, and Rustom. Unfortunately, and unbeknownst to Plaintiffs, the Investor Defendants continued the fraudulent scheme, and made numerous additional fraudulent promises all with no present intention of keeping them.

**ANSWER**:  The term "Investor Defendants" as used in the Amended Complaint is defined in terms that are overly broad and too vague for Defendants to determine their meaning. Any response in this filing is on behalf of Defendants as that term is defined on page 2 above.

Defendants deny that any of the Defendants engaged in any fraudulent scheme. Defendants deny that Biden or Rustom has or had any ownership or financial interest in Americore. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23 of the Amended Complaint and therefore deny them.

24.  In June 2018, a friend of DMM's owners called Biden to ascertain Americore's intent to proceed with the proposed acquisition. Biden instructed that Plaintiffs should no longer speak with Americore and White, but instead should deal exclusively with the Investor Defendants and their respective agents going forward, who would ensure that Plaintiffs' model would find its way into hospitals and thrive. Through subsequent communications to Frey, the Investor Defendants made clear that the investment in Plaintiffs' businesses would not be through Americore, but instead come directly through them.

**ANSWER**:  Upon information and belief, the friend of DMM's owners referenced in paragraph 24 of the Amended Complaint is a businessman named Frank Zaccanelli ("Zaccanelli").

Defendants admit that in or about June 2018, Zaccanelli contacted Biden to discuss a potential transaction between DMM and Americore. Subsequently, after Zacccanelli's counterproductive behavior and erratic temperament became known to Defendants, Defendants explicitly and repeatedly told Plaintiffs that they would never consummate a transaction with Plaintiffs if Zaccanelli were involved in any way. Defendants deny the remaining allegations in paragraph 24 of the Amended Complaint.

25.     Beginning in July 2018, the Investor Defendants promised Plaintiffs that a large infusion of cash to fuel the acquisition was going to be available through the Platinum Group.

**ANSWER**:     Defendants deny the allegations in paragraph 25 of the Amended Complaint.

26.     In August 2018, for example, Biden and Lewitt attended a summit in Dallas to discuss working with Plaintiffs. At this meeting, it was agreed that there would be a $10 million cash infusion dispersed in the following manner: 1) $3.5 million for the purchase of DMM stock and loan repayment; 2) $3 million for the acquisition of AMS; and 3) $3.5 million for operational capital and repayment of DMM overhead loans.

**ANSWER**:     Defendants admit that Biden and Lewitt attended a meeting, rather than a summit, in Zaccanelli's home in Dallas, wherein Zaccanelli represented himself as Michael Frey's advisor and mentor, exaggerated the success of Frey's business and Frey's business acumen, and intimated that he would serve on the board of directors of any company that resulted from investments by the Defendants in DMM, notwithstanding that Zaccanelli was unwilling to invest any capital of his own. Zaccanelli also solicited Defendants for capital for his own real estate projects separate from Defendants' businesses. Defendants admit that they generally discussed the terms of a potential transaction with DMM but made it clear that any transaction would be subject to, among other things, satisfactory due diligence, definitive documentation, and financing. Defendants deny the remaining allegations in paragraph 26 of the Amended Complaint, including that any agreement was reached during that meeting.

27.     The $3.5 million for operational capital and repayment of DMM overhead consisted of, in small part, a series of loans to DMM by Third Friday Fund, which ultimately totaled $434,000.00 to DMM. These loans later proved to be nothing more than a series of fraudulent inducements to drag the process out and allow Defendants to steal Plaintiffs' business model.

**ANSWER**:     Defendants admit that at the request of, and as a financial accommodation to, DMM during the pendency of the negotiations, that certain loans were made, totaling at least $766,495 in principal (not $434,000 as Plaintiffs allege). These loans remain unpaid and are the subject of Third Friday Fund's Complaint filed on or about July 19, 2019 in the Third Friday Fund Florida Loan Action. Defendants deny the remaining allegations in paragraph 27 of the Amended Complaint.

28.     At this Dallas meeting, the Investor Defendants promised Plaintiffs that the deal would close on September 25, 2018.

**ANSWER**:     Defendants deny the allegations in paragraph 28 of the Amended Complaint and at all times conditioned any transaction upon, among other things, satisfactory due diligence, definitive documentation, and financing.

29.     On August 24, 2018, at the airport immediately after the summit, Lewitt sent Frey an email that copied Biden and his wife, Sara Biden, describing in detail the Investor Defendants' reasoning for cutting White and Americore out of the deal with Plaintiffs. (Lewitt Email of August 24, 2018, **Exhibit 2**.) In that email, Lewitt said:

> When I lay out all the facts of what has happened here I don't think there is any reason to wait or that Grant has any defense of any kind - the company has been effectively insolvent since at least May (probably earlier), he asked me make loans without disclosing the MCAs, the company has no functioning accounting system or financial controls, we are losing the confidence of our communities, etc etc. So we need to get him out now and get to work cleaning up the mess he created.

(*Id.*) Ominously, Lewitt also described his strategy should White resist:

> If he doesn't go quietly right away we will do what we have to do and we know how to do that. We should have a draft letter hopefully by end of business tomorrow for everyone to look at. What we need from Michael is an action plan to take over operations of the hospitals from Grant when we do that and effectively lock him out if we have to fight him. I also need the

accounting firm to call me so I can get them set up to do a forensic accounting at the hospitals and holding company. If Grant does decide to fight, my plan will be to come at him very hard out of the box because putting him back on his heels will give us the advantage and we have much greater resources than him and like in any fight the guy who scores the first hard blow will have a huge advantage. Hopefully he will see the wisdom of going gently into the good night especially when we lay out the state of play.

(*Id.*)

**ANSWER**:    Defendants admit that Lewitt emailed Frey on August 24, 2018 after the

meeting at Zaccanelli's home. Defendants deny that they "cut[…] White and Americore out of the

deal" and deny that the email constituted Defendants' purported reasoning for "cutting White and

Americore out of the deal," as such email is taken out of context and is misconstrued by Plaintiffs.

Defendants deny there was anything "ominous" about Lewitt's email.

30.    In the weeks leading up to September 25, 2018, the Investor Defendants repeatedly promised that Plaintiffs would be celebrating a new venture and would be receiving the substantial funding described above. On September 4, 2018, Frey, his wife, and DMM's general counsel dined with Biden and his wife near their home in the Philadelphia, Pennsylvania area, and met with them at their home before and after dinner. At this dinner, Biden and his wife, Sara Biden, repeatedly stated that funding would be wrapped up for September 25, 2018. These statements were untrue in that Biden had no intention of obtaining funding.

**ANSWER**:    Defendants deny that in the weeks leading up to September 25, 2018,

Defendants repeatedly promised that Plaintiffs would be celebrating a new venture and would be

receiving the substantial funding described above because at all times Defendants conditioned any

transaction upon, among other things, satisfactory due diligence, definitive documentation, and

financing, none of which were forthcoming.

Defendants admit that on September 4, 2018, Frey, his wife, and DMM's general counsel

met with Biden and his wife at their home in the Philadelphia, Pennsylvania area. There, the Freys

misrepresented that DMM had a successful operational business model in Alabama, Texas,

Tennessee, and Pennsylvania, among other locations, and that they were expanding to other rural

hospital locations with specific Medicare billing preferences, which Defendants subsequently

learned was not true. The next day, the Freys continued to exaggerate, it was later learned, the purported success of their purported management model and their business. Defendants relied on these representations in continuing to pursue a potential transaction and were hopeful that with funding, programming and promotion, DMM's purported business model could facilitate the rehabilitation of struggling rural hospitals. Defendants deny the remaining allegations in paragraph 30 of the Amended Complaint.

31.     On September 25, 2018, in reliance on the Investor Defendants' representations, Plaintiffs traveled to West Palm Beach, Florida, as planned, and met with the Investor Defendants. The Investor Defendants informed the Plaintiffs that they did not have the money that day, but reassured the Plaintiffs that the investment would be finalized at a meeting as early as the next week in New York City. The meeting never took place.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief as to the occurrence of a meeting on September 25 and therefore deny that allegation. Defendants further deny that Defendants made any representations leading up to that meeting and deny that they "informed the Plaintiffs that they did not have the money that day but reassured the Plaintiffs that the investment would be finalized at a meeting as early as the next week in New York City." Defendants admit that no meeting occurred the following week in New York City. Defendants deny that Plaintiffs had any basis to act in reliance on any representations regarding the basis for the meeting.

32.     In October, November, and December 2018, DMM, its leadership, and investors were inundated with phone calls, text messages, and emails in Tennessee providing constant updates from the Investor Defendants on the ever-imminent funding. The communications contained in these phone calls, text messages, and emails were false in that Defendants had no intention of obtaining funding.

**ANSWER**:     Defendants admit that as evidence of their good faith negotiations, they made their best efforts to keep DMM current on their knowledge of the status of the outstanding

diligence requests and financing. Defendants deny the remaining allegations in paragraph 32 of the Amended Complaint.

33. On October 9, 2018, Lewitt texted Frey in Tennessee that he had "an update on funding" and that "we should have all the documents bank needs by end of the week. Our people are working hard to get this done ASAP." This statement was untrue in that Lewitt had no intention of obtaining funding.

**ANSWER**: Defendants admit that Lewitt texted Frey on October 9, 2018 regarding Lewitt's knowledge of the status of the financing and potential transaction with DMM. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text and therefore deny that allegation. Defendants deny that Lewitt had no intention of obtaining funding.

34. In November, 2018, however, an inadvertently-sent text message raised concern for Plaintiffs. Biden accidentally texted Frey in Tennessee on November 5, 2018: "We can wrap ( A / C ) into Frey's entity *further diluting the both in the process? After we take control of both.* Just a thought. We must have complete control, too many moving pieces. Jim." (**Exhibit 3**, Biden November 5, 2018 Text Message) (emphasis added). After receiving this text message, Frey followed up with Biden but never received an explanation.

**ANSWER**: Defendants admit that Biden sent a text message to Frey containing the language quoted in paragraph 34 of the Amended Complaint but deny that any adverse inference can be made because Plaintiffs have deliberately taken this text out of context and have misconstrued its meaning. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text or the truth of the remaining allegations in paragraph 34 of the Amended Complaint and therefore deny them.

35. At the time, Plaintiffs reasonably trusted the Investor Defendants, all of whom presented themselves as respected business leaders, with significant experience, large investment portfolios, and trustworthy records. Although Biden's text raised somewhat of a red flag with Plaintiffs initially, Biden and the other Investor Defendants continued to reassure Plaintiffs that the acquisition would still going to occur in accordance with the previously-discussed terms.

**ANSWER**:     Defendants deny that Defendants continued to reassure Plaintiffs on the basis that there were no definitive previously-discussed terms. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 of the Amended Complaint and therefore deny them.

36.     On November 11, 2018, Biden left a voicemail for Dr. Mohannad Azzam, founder of AMS and Chief Medical Officer of DMM, pleading for a presentation on Plaintiffs' diabetes care model: "I need that material tonight for my meeting tomorrow." "I'm going to be with [investors]," Biden explained, "and I just wanted to have it with me. So if you can get it to me I'll have that letter for you, that contract for you by Friday *at the latest*, OK? *And uh, the funding, uh, to follow*." (emphasis added). AMS sent the requested information to Biden, but the letter, contract, and funding never followed.

**ANSWER**:     Biden admits that he requested information regarding a diabetes care model from Azzam for potential investors. However, Azzam provided information that was totally inadequate and incomplete. Defendants admit that funding never followed because, among other reasons, (i) Plaintiffs failed to provide requested diligence, (ii) Plaintiffs made misstatements about their operating performance; (iii) Plaintiffs misrepresented Zaccanelli's continuing involvement in the transaction; and (iv) Plaintiffs concealed the acquisition of two operating companies that drastically adversely impacted DMM's cost structure. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 of the Amended Complaint and therefore deny them.

37.     On December 12, 2018, Lewitt texted Frey in Tennessee yet again and removed any doubt that he spoke for Investor Defendants:

> We are working 24/7 to get this deal closed ASAP. I apologize for this taking so long. I promise we will get it done and that it will be worth the wait. . . . [T]he future is going to be great and if there is anything I can do please don't hesitate to call 24/7. I believe in you . . . and am proof [proud] to be working with you *and I speak for Amer and Skip and Jim as well*.

(emphasis added).

**ANSWER**: Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 37 of the Amended Complaint, which reflected Lewitt's knowledge at the time and his good faith negotiations with DMM and the Freys, which were at all times subject to satisfactory due diligence, definitive documentation, and financing. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text or the truth of the remaining allegations in paragraph 37 of the Amended Complaint and therefore deny them.

38.     On December 17, 2018, Lewitt sought additional information from Frey in Tennessee in order to secure funding from the Qatar Investment Authority: "Need the last info on the hospitals so I can knock off the presentation. Doesn't have to be exact just rough estimates the I can get this in front of them asap. Just estimates of what the hospitals approved value is thanks. They are waiting for the package."

**ANSWER**: Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 38 of the Amended Complaint, which reflected Lewitt's good faith efforts to secure financing for the potential transaction, subject to satisfactory due diligence, definitive documentation, and financing. Defendants deny that Lewitt sought information from Frey to secure funding from the Qatar Investment Authority. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text or the truth of the remaining allegations in paragraph 38 of the Amended Complaint and therefore deny them.

39.     Later that day, Lewitt confirmed receipt and shed additional light on the quality of information he was providing to the foreign investors, sending this communication to Frey in Tennessee: "Got it am reading the full article now on internet. Just make up some numbers throw darts it doesn't matter nobody is going to hold you to them they just have to see stuff look a certain way it's a Middle Eastern thing." (**Exhibit 4**, Lewitt December 17, 2018 Text Message).

**ANSWER**: Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 39 of the Amended Complaint, which reflected Defendant Lewitt's good faith efforts to secure financing for the potential transaction, subject to satisfactory due

diligence and definitive documentation. Defendants deny that Lewitt's text message "shed additional light on the quality of information he was providing to the foreign investors" because the text is deliberately taken out of context and is being deliberately misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text or the truth of the remaining allegations in paragraph 39 of the Amended Complaint and therefore deny them.

40.     In short, Defendant Lewitt—who in the past has been registered as a broker-dealer with FINRA—was directing Frey to make false statements to potential investors, which, of course, he did not (and could not legally) do.

**ANSWER**:     Defendants deny that Lewitt has ever been registered as a broker-dealer with FINRA or that Lewitt was directing Frey to make false statements to potential investors,

41.     On December 26, 2018, Platinum Group and DMM exchanged a draft Stock Purchase Agreement pursuant to which Platinum Group would acquire 60% DMM's stock for $3.5 million. Under the same Stock Purchase Agreement, Platinum Group was set to purchase Dr. Azzam's medical practice for an additional $3.5 million and pay DMM an additional $3 million "for general corporate purposes, including repayment of debt owed to The Third Friday Total Return Fund, L.P. and Americore Holdings, LLC." This transaction did not close. Defendants had no intention of ever closing on the transaction and instead used the exercise of exchanging drafts to string the Plaintiffs along.

**ANSWER**:     Defendants admit that Lewitt sent a draft Stock Purchase Agreement to DMM on December 26, 2018, pursuant to which Platinum Global Healthcare Partners LLC would acquire 60% of DMM's stock for $3.5 million and Platinum Global Healthcare Partners LLC would purchase Azzam's medical practice for an additional $3.5 million and provide DMM with an additional $3 million "for general corporate purposes, including repayment of debt owed to The Third Friday Total Return Fund, L.P. and Americore Holdings, LLC," but further admit that the Stock Purchase Agreement was subject to completion of due diligence and other conditions.

Defendants further admit that the transaction never closed because of, among other things: (i) Plaintiffs' failure to provide requested diligence; (ii) Plaintiffs' misstatements about their

operating performance; (iii) Plaintiffs' misrepresentations about Zaccanelli's continuing involvement in the transaction; and (iv) Plaintiffs' concealment of the acquisition of two operating companies that drastically adversely impacted its cost structure.

Defendants deny that they had no intention of ever closing on the transaction or used the exercise of exchanging drafts to string Plaintiffs along because, among other evidence of Defendants good faith in the negotiations, Third Friday Fund loaned DMM over $750,000 so that DMM could meet its payroll over a six-month period while the parties explored a transaction, and continually kept Plaintiffs up to date on the status of the financing, and repeatedly requested diligence information, which Plaintiffs failed to provide to Defendants' reasonable satisfaction.

42.     The Investor Defendants' illusory promises continued into the new year even as Plaintiffs grew concerned. On January 8, 2019, Biden texted Frey in Tennessee, claiming he was preparing to board a flight to Turkey to secure investment:

> I feel Very good. I will feel jubilant *when it I [sic] closed*. Please do not interpret this as anything but complete confidence. *It is going to happen*. We need documentation which will take a few days. We are all in this together, total transparency. We are on our way. I will call you after our call. We have a plane 2/30 hrs. I will try to call before board the plane, if I can't, I will call the moment we land. Sleep well, it will happen. Jim

(emphasis added).

**ANSWER**:     Defendants deny that they made any promises to Plaintiffs. Defendants admit that Biden sent a text message to Frey containing the language quoted in paragraph 42 of the Amended Complaint. Such text reflects Biden's good faith negotiations and the text is deliberately taken out of context and is deliberately being misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in paragraph 42 of the Amended Complaint and therefore deny them.

43.     On January 17, 2019, Rustom, Lewitt, Frey, and Dr. Azzam gathered for a series of business meetings in West Palm Beach and Nashville with Mr. Soner Gedik and Mer Vedat Mungan of Dogan Holdings—a Turkish investment group ("Dogan"), that was, according to the Investor Defendants, interested in investing in Plaintiffs. During his trip to Nashville, Lewitt informed a CEO at a struggling hospital in Manchester, Tennessee, that DMM was about to purchase 200 hospitals. This statement was false in that Lewitt knew he had no intention of ever providing funding.

**ANSWER**:     Defendants admit that Rustom, Lewitt, Frey, and Azzam gathered for a

series of business meetings in West Palm Beach and Nashville with Mr. Soner Gedik and Mer

Vedat Mungan of Dogan Holdings to discuss a possible investment in Plaintiffs, subject to

satisfactory due diligence, definitive documentation, and financing. Defendants deny that Lewitt

informed a CEO at a struggling hospital in Manchester, Tennessee, that DMM was about to

purchase 200 hospitals, that Lewitt made an intentionally false statement, and that Lewitt knew he

had no intention of ever providing funding.

44.     This trip to Nashville was memorialized in a January 17, 2019 agenda signed by Rustom and copying "His Excellency Jim Biden" and his wife "Her Excellency Sara Biden." The agenda conspicuously made no mention of DMM or AMS, but only identified Platinum Group.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 44 of the Amended Complaint and therefore deny them.

45.     On January 23, 2019, Platinum Group, Rustom, and Biden submitted a White Paper to Dogan outlining "Platinum Group Diverse Medical Management (PGDMM)'s business model." What the investors were not told, however, was that this white paper was drafted by Plaintiffs and sent to Biden, Rustom, and Sara Biden; Platinum Group simply replaced all references to Plaintiffs with PGDMM, a non-existent entity. Neither Frey nor Dr. Azzam signed the white paper. Instead, it was submitted by Rustom, "His Excellency Jim Biden," and his wife "Her Excellency Sara Biden." Plaintiffs were not aware that the Investor Defendants had substituted PGDDM's name for Plaintiffs on the White Paper until after the fact.

**ANSWER**:     Defendants admit that on January 23, 2019, The Platinum Group USA,

Rustom, and Biden submitted a White Paper to Dogan outlining "Platinum Group Diverse Medical

Management (PGDMM)'s business model," which was based on information provided by the

Freys. Defendants deny that the White Paper was drafted by Plaintiffs alone and sent to Biden,

Rustom, and Sara Biden. Defendants admit that Biden's wife, Sara Biden, assisted in drafting the White Paper. Defendants deny that Plaintiffs were not aware that Defendants had substituted PGDDM's name for Plaintiffs on the White Paper until after the fact because Sara Biden told Plaintiffs that the White Paper would be submitted as a joint proposal. Biden did not approve the honorary salutation of "His" and "Her Excellency" with respect to Biden and Sara Biden. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 45 of the Amended Complaint and therefore deny them.

46.     On January 23, 2019, after Frey sought greater clarity regarding the status of the investment, Lewitt explained in a text message to Frey in Tennessee: "Ok put Feb 15 just to give us enough time to move money etc and do all the legal work but we should get it done before then."

**ANSWER**:     Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 46 of the Amended Complaint, which reflects Lewitt's knowledge at the time and good faith negotiations and belief that financing would be secured by such date, subject to satisfactory due diligence and definitive documentation, though the text is deliberately taken out of context and is being deliberately misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in paragraph 45 of the Amended Complaint and therefore deny them.

47.     On January 31, 2019, Lewitt informed Frey via text message to Tennessee: "Just to be clear the Turks approved the investment and we are working on the term sheet." Lewitt further offered that "if any of your investors have questions I am happy to speak to them and I promise I will be nice." This statement was false in that the "Turks" had not approved the investment, and Lewitt had no intention of providing funding to Plaintiffs.

**ANSWER**:     Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 47 of the Amended Complaint, which reflects Lewitt's knowledge at the time and good faith understanding of the status of the financing for a potential transaction

which was at all times subject to satisfactory due diligence and definitive documentation, though the text is taken out of context and is being deliberately misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text. Defendants deny that Lewitt had no intention of providing funding to Plaintiffs or that Lewitt made any false statements to Plaintiffs.

48. On February 4, 2019, Rustom emailed Frey in Tennessee attaching a cash flow projection that claimed DMM would, after the promised investment, make $324 million in management revenue alone between the investment and the close of fiscal year 2023. (**Exhibit 5**, Rustom February 4, 2019 Email and Attachment.) Rustom knew that these numbers were fictional, in that Defendants had no intent to provide an investment.

**ANSWER**: Defendants admit that Rustom emailed Frey attaching a cash flow projection, but such cash flow projection was based on the Freys' own work product and Rustom had no role in preparing the projections. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the email. Defendants deny that Rustom knew that these numbers were fictional because the numbers were prepared entirely by the Freys, not Rustom. Defendants deny that Defendants had no intent to provide an investment.

49. The fraud continued into February when Lewitt repeated this sentiment in a text message to Frey in Tennessee on February 11, 2019: "Quick update Dogan is good to go. As a public company they have some hoops to jump through that they are jumping through but they are telling us everything is a go."

**ANSWER**: Defendants deny the existence of any fraud. Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 49 of the Amended Complaint as evidence of Lewitt's knowledge at the time and good faith negotiations, though the text is deliberately taken out of context and is deliberately being misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text.

50.     Then again, on February 20, 2019, Lewitt stated to Frey that the Dogan investment was "good to go. Dogan has approved the deal and is just doing final stuff needed bc it is a public company. I will get final details hopefully today from Amer." And two hours later: "Quick update. [The investor] is good to go."

**ANSWER**:     Defendants admit that Lewitt sent the text messages to Frey containing the language quoted in paragraph 50 of the Amended Complaint as evidence of Lewitt's knowledge at the time and good faith negotiations, though the text is deliberately taken out of context and is deliberately being misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text.

51.     The next day, on February 21, 2019, Rustom spoke with Dr. Azzam and Frey regarding the forthcoming Turkish investment. Rustom communicated that the investment was approved, and only awaited clearance by the International Organization of Securities Commissions, which would be completed within the next two weeks.

**ANSWER**: Defendants deny the allegations in paragraph 51.

52.     Lewitt appeared to be playing every angle this entire time, which clearly took its toll on Lewitt. On February 27, 2019, Lewitt informed Frey in Tennessee that he was "just trying to manage my stress which has hit my digestive system hard." He continued to explain how he was waiting for Americore to close on St. Alexius Hospital in St. Louis and that he needed to "get $1.5 mm back from Grant and then I can breathe." In light of Biden's warning to Plaintiffs to avoid Americore and Grant White, this was concerning but the Defendants' repeated promises, backed up by their backgrounds and impressive biographies allowed Plaintiffs to believe them. After Lewitt got his money from White, he explained, he could "then go to Turkey mid-March to close your deal and close our big fund raising and things change."

**ANSWER**:     Defendants deny that Lewitt "appeared to be playing every angle this entire time, which clearly took its toll on Lewitt."  The reference to Lewitt's stress related to a separate transaction that had nothing to do with the potential transaction with Defendants. Defendants admit that in or about February 2019, Lewitt stated words to the effect that once he was repaid $1.5 million by Americore, he would be able to travel to Turkey to address, in part, the proposed transaction with Plaintiffs, as evidence of Lewitt's knowledge at the time and good faith negotiations, though the stated communication is deliberately taken out of context and is

deliberately being misconstrued by Plaintiffs. Defendants deny the remaining allegations in paragraph 52 of the Amended Complaint.

53.     Both Plaintiffs were negatively affected while the Investor Defendants conducted their fraudulent scheme. Specifically, AMS, which was led by DMM's Chief Medical Director, was left in limbo because it was not being funded or acquired, even after Biden's November 2018 voicemail and promises. Frey raised Azzam's concerns to Lewitt, who responded to Frey in Tennessee on February 28, 2019, that Frey should "tell [Azzam Medical Services] I guarantee payment."

**ANSWER**:     Defendants deny that they conducted any fraudulent scheme. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53 of the Amended Complaint and therefore deny them.

54.     In mid-March of 2019, Defendants promised DMM that they were going to partner with Cliff Creek Builders to develop a new state-of-the-art rural health hospital in Paris, Texas, and that DMM would be contracted to provide management services for the new hospital. Defendants had no intention of developing the Paris hospital, and the opportunity never materialized.

**ANSWER**:     Defendants deny that they made any promises to DMM regarding a partnership with Cliff Creek Builders in Paris, Texas or that DMM wold be contracted to provide management services for a new hospital because it was premature as the transaction with DMM was not finalized and was still subject to satisfactory due diligence, definitive documentation, and financing. Defendants admit that they told Frey they had no immediate intention of developing the Paris hospital because their involvement in that project was contingent upon closing the DMM acquisition, which was not finalized because it was still subject to satisfactory due diligence, definitive documentation, and financing.

55.     The Investor Defendants' stalling dragged into late March. On March 25, 2019, Frey inquired about the status of the still-unfunded venture. Lewitt initially responded in an attempt to maintain the status quo, "Nothing has changed." Perhaps sensing that he needed to keep Plaintiffs at the table, Lewitt supplemented his response the very next day in order to further the fraud, sending a text to Frey in Tennessee that read: "Actually things have changed. We have multiple companies that want to do the deal now!!!"

**ANSWER**:    Defendants deny that Defendants engaged in any stalling, or that Lewitt

"perhaps sens[ed] that he needed to keep Plaintiffs at the table." Defendants deny that there was a

fraud or that Lewitt sent any text messages to Frey in furtherance of any fraud. Defendants admit

that Lewitt did send a text message to Frey containing the language quoted in paragraph 55 of the

Amended Complaint, which reflects Defendant Lewitt's knowledge at the time and good faith

belief as to the status of the financing, though the text is deliberately taken out of context and is

deliberately being misconstrued by Plaintiffs. Defendants lack knowledge or information

sufficient to form a belief as to Frey's location at the time of the text.

56.    By late March to early April 2019, the Investor Defendants' ongoing fraud had
become apparent. Specifically, the Investor Defendants' leadership and agents began
communicating with Plaintiffs' current investors and promising the current investors that they
would be repaid within two weeks. For example, one such call occurred between Biden and
Tennessee-based investor, Eric Burch, in March of 2019. (**Exhibit 6**, Burch Affidavit.). During
this conversation, Biden assured Mr. Burch that the funding for the acquisition of DMM was in
place, and that the transaction would be completed no later than two weeks from the conversation.
When the two weeks came to pass, it started to become clear to Plaintiffs and their investors that
the Investor Defendants had no interest in investing, but instead were executing a fraudulent
scheme.

**ANSWER**:    Defendants deny any fraud scheme. Defendants further deny that

Defendants' leadership and agents began communicating with Plaintiffs' current investors to

promise the current investors that they would be repaid within two weeks. Defendants admit that,

after repeated requests by Frey, Biden communicated with Burch during a three-way telephone

call, arranged by Frey, among Messrs. Biden, Burch and Frey, but deny that any promises of

funding or repayment were made. Defendants admit that Biden understood that Frey wanted Biden

to talk with DMM's shareholder to provide an update as to the negotiations because Frey told

Biden and Lewitt that DMM's shareholders were losing faith in Frey and putting extreme pressure

on him to return their money to them. Defendants deny the remaining allegations in paragraph 56

of the Amended Complaint.

57.     Shortly thereafter, DMM's general counsel called Platinum Group's outside transactional counsel, George Mesires, with representatives of Plaintiff and Defendant on the phone, to get to the bottom of the investment status. It became apparent on the call that Mr. Mesires was unaware of the promised investments made by his client. This eliminated any remaining doubt at DMM about the Investor Defendants' fraudulent scheme.

**ANSWER**:     Defendants admit that on or about April 23, 2019, there was a conference call among DMM's general counsel and representatives for Plaintiffs and outside counsel for Defendants to discuss the status of the transaction after Defendants learned of several materially adverse business developments, including (i) the admission on March 28, 2019 by Frey and Azzam that DMM was "in an insolvent position, and in a very precarious and serious situation with Medicare;" and (ii) that DMM had reinjected Zaccanelli into negotiations, which Frey and Azzam knew was categorically unacceptable to the investor group. Defendants admit that during that conference call, the Defendants learned for the first time that DMM had secretly acquired two businesses – Newcare and GCG – that would significantly increase DMM's payroll, and that DMM expected Third Friday Fund to loan it additional money to fund this higher payroll two days later (without any prior communication or notice and without any obligation on Third Friday Fund's part to do so), a demand that Third Friday Fund declined. Defendants deny that there were any promises made by The Platinum Group USA to Plaintiffs, and as such deny that outside counsel was unaware of those promises. Defendants further deny that Defendants engaged in any fraudulent scheme.

58.     Plaintiffs were not merely waiting for an investment that never came. They were taking actions to further their business development in reliance on the Defendants' fraud. At the same time that they were promising certain and imminent capital, Defendants repeatedly directed Plaintiffs to acquire various service lines, products, companies, hospitals, and the accompanying liabilities (such as payroll). The Investor Defendants explicitly instructed DMM to extend itself and grow beyond its core business model with the express promise that the imminent—and certain—investment would cover the growth. Again, Defendants' ultimate goal was to drive Plaintiffs' into insolvency so that Defendants could obtain control.

**ANSWER**:    Defendants deny that they committed any fraud, and as such deny that Plaintiffs engaged in any business development in reliance on fraudulent statements made by Defendants. Defendants deny that they ever directed Plaintiffs to acquire any other product lines, companies, or hospitals or to assume any liabilities at any time. Defendants deny that Defendants ever "explicitly instructed" DMM to extend itself or to grow beyond its core business model, but rather did the opposite by instructing DMM not to undertake <u>any</u> contractual obligations until it completed an investment in the company. Defendants admit that the Freys repeatedly proposed acquisitions of various other businesses and even asked them to make payments to other businesses to which they had made commitments that they were not in a position to fulfill, which Defendants discouraged as premature. Defendants deny that their ultimate goal was to drive Plaintiffs' into insolvency so that Defendants could obtain control, which makes no business sense because driving DMM into insolvency would place repayment of Third Friday Fund's loans at risk.

59.    For example, on December 4, 2018, Lewitt told Frey in Tennessee that the Investor Defendants were "moving hard on raising our $$& [sic] from multiple places and they are all over us for more Healthcare we are asking them for $160 mm for you my brother *so go find some hospitals to buy*." (emphasis added).

**ANSWER**:    Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 59 of the Amended Complaint as evidence of Lewitt's knowledge at the time and good faith negotiations, though the text is deliberately taken out of context and is deliberately being misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text.

60.    In late-December 2018, the Investor Defendants encouraged Plaintiffs to acquire a Middle Tennessee-based company called Geriatric Consulting Group ("GCG") and its sister company that handles management issues, Newcare. (*See* Miller Affidavit, **Exhibit 7**.) Specifically, Biden instructed Frey to make them a cash offer of $3.2 million to be paid out over a three-year period. While Frey was reluctant to make the offer, Biden stressed that the acquisition was essential in order to attract investment from abroad.

**ANSWER**:   Defendants deny that Defendants had any authority to dictate business acquisitions for the Plaintiffs, or that they encouraged Plaintiffs to acquire Geriatric Consulting Group or Newcare without any diligence or secured financing. Defendants deny that Biden instructed Frey to make them a cash offer of $3.2 million to be paid out over a three-year period or that Biden stressed that the acquisition was essential in order to attract investment from abroad. Defendants admit that Plaintiffs never informed them that they consummated any transaction with these companies until April 23, 2019. Moreover, the Miller Affidavit is unsworn and does not support the contention that Defendants encouraged Plaintiffs to acquire GCG and Newcare, or that Biden instructed Frey to make an offer for such companies.

61.    The investment never came, but Frey and DMM were left to assume the liabilities due as a result of the acquisition. Approximately four months after the acquisition, GCG's employees rolled into DMM and DMM became responsible for meeting payroll and paying overhead. In the immediate aftermath, the acquisition seemed impossible, and GCG even overdrew its account nearly $80,000. Over time, however, DMM has been able to incorporate GCG and Newcare into Unity Medical Center in Manchester, Tennessee, and the company is able to cover its own payroll and overhead, with great difficulty. The stress and harm done to Plaintiffs and their reputations while attempting to right the ship, however, was significant. Additionally, the acquisition price set by Biden remains unpaid, an obligation that Plaintiffs still owe.

**ANSWER**:   Defendants deny that Biden had any authority to dictate business acquisitions for the Plaintiffs, set any acquisition price for Geriatric Consulting Group or Newcare, or that he was involved in any way in such transaction. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 61 of the Amended Complaint and therefore deny them. Defendants admit that Frey, Azzam and DMM failed to disclose to Defendants the acquisitions and the significant adverse effect the acquisitions had on DMM's cost structure until four months after the acquisitions in the April phone call discussed above.

62.    Throughout this time, Plaintiffs continually communicated with the Investor Defendants for reassurances that the promised investment capital was imminent, as Plaintiffs took

on further obligations as directed by Defendants. For example, on February 13, 2019 Frey explained to Lewitt that "[w]e have hundreds of contracted homes and four hospitals. But we have to have the operating capital to bring on the help."

**ANSWER**:    Defendants deny that Plaintiffs continually communicated with Defendants for reassurances that the promised investment capital was imminent. Defendants further deny that Plaintiffs took on further obligations "as directed by Defendants"; rather, Plaintiffs concealed the Newcare and GCG acquisitions from Defendants for approximately four months.

63.    On March 12, 2019, Frey spoke with GCG who expressed their [sic] displeasure with the situation. Frey immediately relayed the conversation to Biden, and told Biden that DMM faced potential problems with Medicare and GCG if DMM were to have obtained GCG's employees without the capability to cover the expanded payroll. Biden told Frey not to worry because funding was imminent. This was false, and Biden knew it was false.

**ANSWER**: Defendants deny that Biden told Frey that Frey did not have to worry about any acquisitions DMM made because funding was imminent. Defendants further deny that Biden made any knowingly false statements regarding imminent funding. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of the Amended Complaint and therefore deny them.

64.    Shortly after the call, Frey sent a text message to Lewitt bemoaning how bad a day he was having. Lewitt responded via a text message to Frey in Tennessee that stated "Jim told me. Don't worry every time someone threatens to sue you you're with us now nobody is gonna touch you." (**Exhibit 8**, Lewitt text of March 12, 2019.) It was Frey's understanding that Lewitt was implying that DMM was "protected" because of Jim Biden's connections.

**ANSWER**: Defendants admit that Lewitt sent a text message to Frey containing the language quoted in paragraph 64 of the Amended Complaint as evidence of Lewitt's good faith negotiations, though the text is deliberately taken out of context and is deliberately being misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to Frey's location at the time of the text or the truth of the remaining allegations in paragraph 64 of the Amended Complaint and therefore deny them.

65.     After the Investor Defendants made their first fraudulent misrepresentations, and as they continued to make further fraudulent misrepresentations, Third Friday Fund was also entering into Unsecured Loan Agreements with DMM. These loans were made to cover working capital and payroll for DMM until the Investor Defendants made the repeatedly promised investment. These loan agreements were procured through fraud.

**ANSWER**:     Defendants deny that Defendants made any fraudulent misrepresentations. Defendants admit that Third Friday Fund entered into ten separate written Unsecured Loan Agreements with DMM as a financial accommodation to DMM at the request of DMM, plus interest, attorneys' fees, and costs, at least four additional undocumented loans in a total amount of not less than $766,495, which amounts remain unpaid and are the subject of the Third Friday Fund Florida Loan Action. Defendants deny that these loans were intended to continue until Defendants made any investment in DMM; DMM was expected to be able to meet its own payroll within a short period of time after the loans began. Defendants deny that any investment was promised. Defendants further deny that the Unsecured Loan Agreements were procured by fraud.

66.     In total, ten (10) loans were made to DMM by Third Friday Fund from July 30, 2018, to December 20, 2018, all explicitly premised on Defendants' fraudulent promises that part of the investment in DMM would be used to repay these loans in full.

**ANSWER**:     Defendants admit that there were ten Unsecured Loan Agreements made by Third Friday Fund to DMM between July 30, 2018, to December 20, 2018, as well as at least four additional loans by Third Friday Fund for which Plaintiffs failed to sign Unsecured Loan Agreements. Defendants deny that any of the Unsecured Loan Agreements were explicitly premised on any fraudulent promises or on completion of an investment in DMM.

67.     Of this series of loans, Third Friday wired $125,000 directly to Integrate Oral Health Care, $37,000 directly to Preventative Diagnostic Services, and the balance to DMM. Lewitt instructed DMM to sign loan agreements including the payments made to Integrate Oral Health Care and Preventative Diagnostic Services because (1) these companies would be subsidiaries of DMM once the promised funding arrived; (2) the repayment of the debt would come immediately out of the $100 million plus imminent investment; and (3) the investors in his fund required the paperwork.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief as to

the allegations that Third Friday Fund wired $125,000 directly to Integrate Oral Health Care and

$37,000 directly to Preventative Diagnostic Services and therefore deny them. Defendants admit

that it wired at least $766,495 to DMM. Defendants deny the remaining allegations in paragraph

67 of the Amended Complaint.

68.     As explained in Paragraph 39 [*sic*], *infra*, a draft Stock Purchase Agreement dated December 26, 2018 was drafted between Platinum Global Healthcare Partners, LLC and DMM under which Platinum Global Healthcare Partners, LLC would pay DMM $3 million "for general corporate purposes, including repayment of debt owed to The Third Friday Total Return Fund, L.P. and Americore Holdings, LLC."

**ANSWER**:     As described in Defendants' answer to paragraph 41, Defendants admit a

draft Stock Purchase Agreement was sent in December 2018.  This document speaks for itself.

69.     On January 14, 2019, after the final loan had been made, Lewitt texted with Frey in Tennessee about how the loans would be repaid by the forthcoming investment and Stock Purchase Agreement. As the draft Stock Purchase Agreement was exchanged between the parties, Lewitt explained that he had to speak with his attorney regarding some "small nits" and asked Frey "were you contemplating the shareholders agreement addressing the $3 mm going into the company for General Corp purposes ***and debt payback***." (emphasis added).

**ANSWER**:     Defendants deny that the final loan was made on January 14, 2019; rather,

the final loan was made in or about the end of February 2019, and the written loan agreements

governing the loans do not condition repayment of the loans on any transaction or any other event.

Defendants admit that Lewitt sent a text message to Frey containing the language quoted in

paragraph 69 of the Amended Complaint as evidence of Lewitt's knowledge at the time and good

faith negotiations, though the text is deliberately taken out of context and is being deliberately

misconstrued by Plaintiffs. Defendants lack knowledge or information sufficient to form a belief

as to Frey's location at the time of the text.

70.     But the investment never came, the newly acquired companies' payrolls came due, and Plaintiffs were left on the hook for significant loan obligations procured by Third Friday Fund and Defendants' fraud.

**ANSWER**:    Defendants deny that Defendants never invested in DMM; indeed, Third Friday Fund loaned DMM over $750,000, which remains unpaid. Defendants admit that Defendants never acquired DMM or AMS, based on, among other things, Plaintiffs' failure to provide requested satisfactory due diligence information and DMM's concealment of the acquisition of Newcare and GCG and misrepresentations about Zaccanelli's continuing involvement in their companies. Defendants deny any fraud. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 70 of the Amended Complaint and therefore deny them because Plaintiffs concealed the acquisition of Newcare and GCG until April 2019.

71.    In fact, Third Friday Fund and Lewitt threatened to sue DMM despite their fraudulent behavior—forcing this lawsuit in the process. On April 25, 2019, Lewitt, on behalf of the Third Friday Total Return Fund, sent a letter providing notice that all of the loans and obligations were "immediately due and payable."

**ANSWER**:    Defendants admit that Third Friday Fund sent a demand letter to DMM on or about April 25, 2019 based on DMM's failure to repay over $766,495 in principal loaned to DMM, plus interest and attorneys' fees made by Third Friday Fund to DMM, which is now the subject of Third Friday Fund Florida Loan Action. Defendants deny that Third Friday Fund and Lewitt threatened DMM or engaged in any fraudulent behavior. Defendants further deny that Third Friday Fund and Lewitt's lawful conduct in seeking repayment of DMM's loan obligations forced DMM to file this lawsuit; in fact, Lewitt reached out to DMM to discuss the status of the defaulted loans on more than one occasion but DMM refused to respond.

72.    Strangely, this correspondence copied various attorneys at Faegre Baker Daniels, an international law firm, but was not actually sent by the attorneys.

**ANSWER**:    Defendants deny that it was strange for Third Friday Fund's correspondence to copy its attorneys.

73.     Regardless, it was clear that Lewitt believed he could bully DMM in complete disregard of his fraudulent behavior. This brazen behavior left Plaintiffs with no choice but to bring this lawsuit.

**ANSWER**:     Defendants deny each of the allegations in paragraph 73 of the Amended Complaint.

74.     Lewitt's bullying went beyond the Third Friday Fund loan agreements. Whenever legal formalities and litigation were pressed upon him, he lashed out with threats and invective.

**ANSWER**:     Defendants deny each of the allegations in paragraph 74 of the Amended Complaint.

75.     For example, in November 2018, the parties were working to hammer out the terms of their partnership and acquisition. Along those lines, DMM had outside transactional counsel in Tennessee create a Convertible Secured Promissory Note reflecting the terms and conditions agreed upon by all parties in the months leading up to its creation.

**ANSWER**:     Defendants admit that in November 2018, the parties were working to come to terms on their potential transaction, subject to satisfactory due diligence, financing, and definitive documentation. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 75 of the Amended Complaint and therefore deny them.

76.     But the formal Convertible Secured Promissory Note, drawn up by sophisticated outside counsel with significant experience in healthcare lending, clearly spooked Lewitt and the Investor Defendants. In response, Lewitt (not his own outside counsel) shared a Stock Purchase Agreement that was inconsistent with the parties' negotiations to that point.

**ANSWER**:     Defendants deny that Defendants, including Lewitt, were "spooked" by the proposed Convertible Secured Promissory Note, which, Zaccanelli told Lewitt that Zaccanelli had drafted and that did not reflect the transaction contemplated between the parties. Defendants deny that the Stock Purchase Agreement shared by Lewitt was inconsistent with the parties' negotiations to that point. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 76 of the Amended Complaint and therefore deny them.

77. Outside counsel for DMM explained that "Your skeletal proposal set forth in the Stock Purchase Agreement does not reflect, in any way, the arrangement discussed at great length and agreed upon by the parties."

**ANSWER**: Defendants admit that DMM's outside counsel made the statement quoted in paragraph 77 of the Amended Complaint but dispute that any such agreement was reached.

78. Perhaps sensing Lewitt's true character and fraudulent scheme, DMM's outside transactional counsel laid bare the Investor Defendants' fraudulent scheme:

> [O]n at least five separate occasions, Diverse has received assurances from you and Mr. Biden that edits to the proposed agreement were being completed and funding was imminent. So far, every funding date provided to Diverse was missed. Following your receipt of the Note, Diverse was reassured on numerous occasions that small changes would be made and a slightly revised version of the Note would be forthcoming. Diverse never received your promised edits to the Note. Rather, you provided to me a document that is a complete deviation from the agreed upon arrangement. Further, the content of the Stock Purchase Agreement you proposed gives me great pause as it is deficient in a number of ways and lacks numerous terms and conditions that we would expect to see in an agreement for a transaction of this size. In addition, a Stock Purchase Agreement would typically be accompanied by several other transaction documents, for example, Bylaws, Shareholder Agreement, and Employment Agreements none of which were provided or mentioned. These deficiencies raise questions in my mind regarding the sincerity of the proposal.

**ANSWER**: Defendants deny that DMM's outside counsel is in any position to "sens[e] Lewitt's true character" and further deny that Lewitt or Defendants were engaged in a fraudulent scheme. Defendants admit that DMM's outside counsel sent a communication containing the language quoted in paragraph 78 of the Amended Complaint.

79. DMM's outside counsel further, and presciently, defined the early contours of the Investor Defendants fraud by explaining that DMM had been "diligently negotiating with potential customers in anticipation of the imminent funding that has been promised."

**ANSWER**: Defendants deny that Defendants were engaged in any fraud or that any imminent funding or anything else was ever promised by Defendants to Plaintiffs. Defendants admit that DMM's outside counsel sent a communication containing the language quoted in paragraph 79 of the Amended Complaint.

80.     Outside counsel closed by explaining that "all future communications regarding this matter should be directed to me." She further stated that if Lewitt was represented by counsel she would to do the same.

**ANSWER**:    Defendants admit that DMM's outside counsel sent a communication containing the language quoted in paragraph 80 of the Amended Complaint.

81.     Lewitt's response was unequivocal. He did not deny that promises were made related to investment or that promises were made that caused DMM to negotiate with customers. In fact, just the opposite. Lewitt *contested the insinuation that the promises were illusory*. Lewitt emailed both outside counsel and Frey in Tennessee (despite being told not to communicate with Frey directly), stating that he had "to add that the allegations regarding not providing funding etc are false and we do not appreciate them." Lewitt further lashed out at counsel that sensed his long con: "I know you are putting on a show for your client but this is a friendly deal and if you want it to continue to be a friendly deal you need to adopt the proper tone and drop the nonsense."

**ANSWER**:    Defendants admit that Lewitt sent an email containing the language quoted in paragraph 81 of the Amended Complaint as evidence of Lewitt's knowledge at the time and good faith negotiations, though the email is deliberately taken out of context and is being deliberately misconstrued by Plaintiffs. Defendants deny the remaining allegations in paragraph 81 of the Amended Complaint.

82.     The commencement of this current litigation revealed, once again, Lewitt's anger when confronted with relatively standard litigation procedure, but in a process where his and the Investor Defendants' fraud can be brought into the light.

**ANSWER**:    Defendants deny the allegations in paragraph 82 of the Amended Complaint.

83.     On June 28, 2019, Plaintiffs' counsel served litigation hold notices on each of the Defendants.

**ANSWER**:    Defendants admit the allegations in paragraph 83 of the Amended Complaint.

84.     The service of litigation holds is standard practice when there is a potential for litigation. The American Bar Association includes templates on its website. Litigation holds and the accompanying preservation are especially important in cases, such as this one, where

documents and communications are central to the alleged facts and are susceptible to both automatic and manual deletion.

**ANSWER**:     The allegations in paragraph 84 call for legal conclusions but to the extent that they are construed to be factual allegations, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 of the Amended Complaint and therefore deny them.

85.     Lewitt did not receive Plaintiffs' litigation hold notices well. At 2:58 PM on June 28, 2019—six minutes after receiving Plaintiffs' litigation hold notice—Lewitt responded to the email: "We will [be] suing your clients next week both corporately and personally in view of your slanderous [sic] correspondence." Lewitt, an attorney, inappropriately added Plaintiffs to this email. The original service of the litigation hold notices only included Plaintiffs' counsel.

**ANSWER**:     Defendants admit that Lewitt sent the communication quoted in paragraph 85 of the Amended Complaint and that the litigation hold notices only included Plaintiffs' counsel. Defendants deny that Lewitt acted inappropriately in any manner.

86.     Twelve minutes after that, Lewitt (a member of the bar) decided to threaten Dr. Azzam and Frey—and their wives—personally via text, stating:

> Since you are reaching out to me you should know that my fund is filing suit against your companies next week for failure to repay the loans I made to fund your payroll. Your lawyer's letter is defamatory and as a result of that letter I am now instructing my lawyers to sue each of you and your spouses individually as well. If you think cage fighting is tough wait until you get in the legal ring with me. You are picking a wrong fight with that [sic] wrong guy.

(Lewitt text of June 28, 2019, **Exhibit 9**.) Neither Frey nor Dr. Azzam responded to this threat.

**ANSWER**:     Defendants admit that Lewitt is a licensed attorney and that Lewitt sent the text message quoted in paragraph 86 of the Amended Complaint, though the text is taken out of context and is being misconstrued by Plaintiffs. Defendants deny that Lewitt was threatening Azzam, Frey, or their wives, but was in fact informing them of potential litigation to ensue from the circumstances. Third Friday Fund has asserted the claims Lewitt referred to against the Freys

and Mohannad Azzam in their individual capacity in Third Friday Fund's counterclaims filed

herewith.

87.     Unaware of this text message and in an attempt to defuse the situation (and with his clients now copied on the email), Plaintiffs' counsel responded to Lewitt's 2:58 PM email, stating simply: "I look forward to working with you."

**ANSWER**:     Defendants deny, upon information and belief, that Plaintiffs' counsel was

unaware of this text message. Defendants admit that Plaintiffs' counsel sent the email quoted in

paragraph 87.

88.     Unfortunately, Lewitt was not done protesting this standard litigation hold and continued to threaten Plaintiffs personally. He sent yet another email, warning both Plaintiffs and counsel to "Be careful what you wish for. You won't be working with me. You and your clients will have the worst experience of their lives."

**ANSWER**:     Defendants admit that Lewitt sent the email quoted in paragraph 88 of the

Amended Complaint, though the email is deliberately taken out of context and is deliberately being

misconstrued by Plaintiffs. Defendants deny the remaining allegations in paragraph 88 of the

Amended Complaint.

89.     Unprompted, and without any factual basis, Lewitt sent yet another email only two minutes later and copied his transactional attorney, George Mesires, based in Chicago: "I am instructing my attorney's [sic] to explore criminal charges as well against Diverse and the Frey's [sic] and Azzam."

**ANSWER**:     Defendants admit that Lewitt sent the email quoted in paragraph 89 of the

Amended Complaint. Defendants deny that the email was sent without any factual basis.

90.     On Tuesday, July 2, 2019, Lewitt emailed Plaintiffs and their counsel unprompted once again. Lewitt's email was nothing more than a thinly-veiled threat masquerading as an attempt to comply with the litigation hold notice:

> In reviewing and preserving documents as you requested, I came across an agreement dated 8/31/18 whereby Diverse and my fund purchased $125,000 of Stanous Flouride Rinse from Integrate Oral Care, LLC. Can your client tell me what happened to the product and my fund's money? Diverse was supposed to sell these goods and share 50% of the profits with my fund.

37

**ANSWER**:    Defendants admit that Lewitt sent the email quoted in paragraph 90 of the Amended Complaint. Defendants deny that the email constituted a threat and deny that Defendants have ever explained the disposition of the funds allegedly sent to Integrate Oral Care, LLC.

91.    Counsel for Plaintiffs politely requested that Lewitt "cease communications with my clients, as they are represented by counsel" and offered to communicate directly with Lewitt's outside counsel as well.

**ANSWER**:    Defendants admit that Plaintiffs' counsel sent the email quoted in paragraph 91 of the Amended Complaint.

92.    Lewitt snapped back: "Just answer the question and stop the bullshit. I am an attorney and I am communicating with you. If your client can't handle dealing with this he shouldn't have stolen money from my fund." Plaintiffs were, once again, included on this email.

**ANSWER**:    Defendants admit that Lewitt sent the email quoted in paragraph 92 of the Amended Complaint but deny the characterization of the email. Defendants admit that Plaintiffs have still not explained what happened to the funds allegedly sent to Integrate Oral Care, LLC.

## DAMAGES

93.    While the Defendants were making their series of fraudulent promises, Plaintiffs were implementing the model in rural hospitals and communities in reliance on these promises. What's more, the Defendants were learning more and more about Plaintiffs' business model and what made it so successful.

**ANSWER**:    Defendants deny each of the allegations in paragraph 93 of the Amended Complaint.

94.    Plaintiffs' were also taking on additional responsibility and service lines at this time through the planned and actual acquisition of complementary businesses and entities. DMM was doing so not only based on the Defendants' promises of funding, but at their specific direction and encouragement, as illustrated above. This has resulted in Plaintiffs assuming significant financial obligations, primarily in the shape of numerous medical providers needing to be paid. But without the promised investment, Plaintiffs can only make payroll for a very limited time.

**ANSWER**:    Defendants deny that they made promises of funding, as any transaction was premised upon, among other things, satisfactory due diligence, definitive documentation, and

financing, and therefore deny that DMM reasonably or justifiably took on additional responsibility and service lines based on the Defendants' purported promises of funding or at their specific direction and encouragement. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 94 of the Amended Complaint and therefore deny them.

95.     Finally, the Defendants' fraud and inability to invest thwarted potential business deals and future business opportunities for Plaintiffs and directly caused other entities that were scheduled to roll into DMM and Azzam Medical Services to go insolvent.

**ANSWER**:     Defendants deny that they engaged in any fraud or were unable to invest in DMM, but rather were unwilling to do so after, among other things, discovering DMM's concealment of its acquisition of Newcare and GCG and other misrepresentations and omissions. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 95 of the Amended Complaint and therefore deny them.

## CLAIMS FOR RELIEF
### Count I – Common Law Fraud
### (Against All Defendants)

96.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**:     Defendants allege and by this reference fully incorporate paragraphs 1 through 95 of their Answer.

97.     Defendants intentionally misrepresented multiple material facts and produced false impressions on the part of Plaintiffs in order to mislead them and obtain an undue advantage over them in the marketplace.

**ANSWER**:     Defendants deny the allegations contained in paragraph 97 of the Amended Complaint.

98.     Defendants made the repeated representations, including but not limited to their repeated promises that funding was certain and nearly secured and that Plaintiffs should acquire

complimentary businesses on promises of future reimbursement, with knowledge of their falsity and with a fraudulent intent.

**ANSWER**: Defendants deny the allegations contained in paragraph 98 of the Amended Complaint.

99. Defendants' representations, outlined above, were made with respect to material and existing facts related to Plaintiffs' business.

**ANSWER**: Defendants deny the allegations contained in paragraph 99 of the Amended Complaint.

100. Plaintiffs reasonably relied upon those repeated misrepresentations by both conducting its business in accord with these repeated misrepresentations and forgoing other funding opportunities for more than a year.

**ANSWER**: Defendants deny the allegations contained in paragraph 100 of the Amended Complaint.

101. Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

**ANSWER**: Defendants deny the allegations contained in paragraph 101 of the Amended Complaint.

<u>**Count II – Promissory Fraud**</u>
**(Against All Defendants)**

102. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**: Defendants allege and by this reference fully incorporate paragraphs 1 through 101 of their Answer.

103. Defendants intentionally and repeatedly misrepresented material facts, while producing false impressions on the part of Plaintiffs, in to order mislead Plaintiffs and obtain an undue advantage over it in the marketplace.

**ANSWER**: Defendants deny the allegations contained in paragraph 103 of the Amended Complaint.

Case 4:19-cv-00046-CLC-CHS   Document 28   Filed 08/27/19   Page 40 of 60   PageID #: 496

104.     Repeated representations, including but not limited to Defendants' repeated promises that an acquisition was imminent, investment funding was nearly secured, and that Plaintiffs should acquire complimentary business lines on promises of future reimbursement, were made by Defendants with contemporaneous knowledge of their falsity and with a fraudulent intent.

**ANSWER**:     Defendants deny the allegations contained in paragraph 104 of the Amended Complaint.

105.     Plaintiffs reasonably relied upon those repeated misrepresentations by both conducting its business in accord with these repeated misrepresentations and forgoing other funding opportunities for more than a year.

**ANSWER**:     Defendants deny the allegations contained in paragraph 105 of the Amended Complaint.

106.     Defendants repeated statements embodied promises of future action despite having no present intention to carry out the promise.

**ANSWER**:     Defendants deny the allegations contained in paragraph 106 of the Amended Complaint.

107.     Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

**ANSWER**:     Defendants deny the allegations contained in paragraph 107 of the Amended Complaint.


**Count III – Fraudulent Inducement**
**(Against Third Friday Fund and Lewitt)**

108.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**:     Defendants Third Friday Fund and Lewitt allege and by this reference fully incorporate paragraphs 1 through 107 of their Answer.

109.     DMM entered into ten (10) unsecured loan agreements with Third Friday Fund, dating from July 30, 2018 to December 20, 2018.

**ANSWER**: Defendants Third Friday Fund and Lewitt admit the allegations in paragraph

109 of the Amended Complaint.

110. As outlined above, Third Friday Fund and Lewitt made numerous false statements material to the loan agreements including, but not limited to, the repeated promises that the loans would be repaid with any forthcoming investment.

**ANSWER**: Defendants Third Friday Fund and Lewitt deny the allegations in paragraph

110 of the Amended Complaint.

111. Third Friday Fund and Lewitt knew that these statements were false or, at a minimum, made them with an utter disregard for the truth of these statements.

**ANSWER**: Defendants Third Friday Fund and Lewitt deny the allegations in paragraph

111 of the Amended Complaint.

112. Third Friday Fund and Lewitt also made these statements with the intent of inducing reliance on the statement by saddling DMM with debt while simultaneously furthering the fraudulent scheme carried out by the Defendants. Indeed, DMM did reasonable rely on these promises that the loan agreements would be repaid with investment funds.

**ANSWER**: Defendants Third Friday Fund and Lewitt deny the allegations in paragraph

112 of the Amended Complaint.

113. DMM has suffered an injury as a result of its reliance on Third Friday Fund and Lewitt's fraudulent promises in the amount of almost $600,000 in principal loaned to DMM to cover operations and entities that Plaintiffs were encouraged to acquire by Defendants and on the promise that investment would cancel out this debt.

**ANSWER**: Defendants Third Friday Fund and Lewitt deny the allegations in paragraph

113 of the Amended Complaint.

114. Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

**ANSWER**: Defendants Third Friday Fund and Lewitt deny the allegations in paragraph

114 of the Amended Complaint.

## Count IV - Declaratory Judgment
### (Against Third Friday Fund)

115.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**:    Defendant Third Friday Fund alleges and by this reference fully incorporates paragraphs 1 through 114 of its Answer.

116.    DMM entered into ten (10) unsecured loan agreements with Third Friday Fund, dating from July 30, 2018 to December 20, 2018.

**ANSWER**:    Defendant Third Friday Fund admits the allegations in paragraph 116 of the Amended Complaint.

117.    DMM entered into these agreements in reliance on the Investor Defendants' repeated promises that investment was imminent and that these loans were intended to maintain DMM's status quo until said investment was finalized.

**ANSWER**:    Defendant Third Friday Fund denies the allegations in paragraph 117 of the Amended Complaint.

118.    As a result of the ongoing fraud outlined above, DMM seeks a declaration under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, that the unsecured loan agreements are voidable because they were procured fraudulently.

**ANSWER**:    Defendant Third Friday Fund denies the allegations in paragraph 118 of the Amended Complaint.

## Count V – Civil Conspiracy
### (Against All Defendants)

119.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**:    Defendants allege and by this reference fully incorporate paragraphs 1 through 118 of their Answer.

120.    Defendants, and each of them, had a common design to steal Plaintiffs' business model and/or drive Plaintiffs into insolvency.

**ANSWER**: Defendants deny the allegations contained in paragraph 120 of the Amended Complaint.

121.    Defendants acted in concert to steal Plaintiffs' business model, which is an unlawful purpose. Specifically, Defendants stole Plaintiffs' business model and implemented the model at Ellwood City Medical Center, in Ellwood City, Pennsylvania and, upon information and belief, additional rural healthcare facilities.

**ANSWER**: Defendants deny the allegations contained in paragraph 121 of the Amended Complaint.

122.    Defendants' fraudulent promises to DMM were unlawful means.

**ANSWER**: Defendants deny the allegations contained in paragraph 122 of the Amended Complaint.

123.    Plaintiffs were damaged as a result of Defendants' civil conspiracy, in an amount to be determined at trial.

**ANSWER**: Defendants deny the allegations contained in paragraph 123 of the Amended Complaint.

124.    Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

**ANSWER**: Defendants deny the allegations contained in paragraph 124 of the Amended Complaint.

## Count VI – Tortious Interference with Business Relationships
### (Against All Defendants)

125.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**: Defendants allege and by this reference fully incorporate paragraphs 1 through 124 of their Answer.

126.    Plaintiffs had existing business relationship with specific third parties, including the hospitals and hospital systems they were considering acquiring.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 of the Amended Complaint and therefore deny them.

127. Plaintiffs had potential business relationships with other rural healthcare providers across the United States.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 of the Amended Complaint and therefore deny them.

128. Defendants' knew of Plaintiffs' existing and potential business relationships.

**ANSWER**: Defendants deny the allegations contained in paragraph 128 of the Amended Complaint.

129. Defendants intended to cause the termination or otherwise interfere of Plaintiffs' business relationships.

**ANSWER**: Defendants deny the allegations contained in paragraph 129 of the Amended Complaint.

130. Defendants used improper means, including making false promises to Plaintiffs and other misrepresentations regarding (later-discovered, nonexistent) impending funding for their business plan.

**ANSWER**: Defendants deny the allegations contained in paragraph 130 of the Amended Complaint.

131. Defendants had an improper motive; specifically, to drive Plaintiffs into insolvency and to misappropriate Plaintiffs' business model.

**ANSWER**: Defendants deny the allegations contained in paragraph 131 of the Amended Complaint.

132. Plaintiffs suffered damages in an amount to be determined at trial resulting from the Defendants' tortious interference with its business relationships.

**ANSWER**: Defendants deny the allegations contained in paragraph 132 of the Amended Complaint.

133.    Because Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, Plaintiffs are entitled to punitive damages.

**ANSWER**:    Defendants deny the allegations contained in paragraph 133 of the Amended Complaint.

## Count VII – Promissory Estoppel/Detrimental Reliance
### (Against All Defendants)

134.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**:    Defendants allege and by this reference fully incorporate paragraphs 1 through 133 of their Answer.

135.    As laid out above, Defendants made many different promises to Plaintiffs, including but not limited to the promises to fund Plaintiffs' innovative healthcare delivery model.

**ANSWER**:    Defendants deny the allegations contained in paragraph 135 of the Amended Complaint.

136.    Defendants' promises regarding providing funding were clear, specific, and unambiguous.

**ANSWER**:    Defendants deny the allegations contained in paragraph 136 of the Amended Complaint.

137.    Defendants should have reasonably expected their promises to induce action and/or forbearance on the part of Plaintiffs.

**ANSWER**:    Defendants deny the allegations contained in paragraph 137 of the Amended Complaint.

138.    Plaintiffs reasonably relied upon the promises of Defendants to their detriment.

**ANSWER**:    Defendants deny the allegations contained in paragraph 138 of the Amended Complaint.

139.    Plaintiffs suffered damages in an amount to be determined at trial as a result of their reasonable reliance on Defendants' unfulfilled promises.

**ANSWER**:    Defendants deny the allegations contained in paragraph 139 of the Amended Complaint.

## Count VIII – Negligent Misrepresentation
### (Against All Defendants)

140.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs by reference.

**ANSWER**:    Defendants allege and by this reference fully incorporate paragraphs 1 through 139 of their Answer.

141.    Defendants supplied information regarding their intent to provide funding and the assurance of definite and imminent funding to Plaintiffs.

**ANSWER**:    Defendants deny the allegations contained in paragraph 141 of the Amended Complaint.

142.    The information that Defendants supplied to Plaintiffs was false.

**ANSWER**:    Defendants deny the allegations contained in paragraph 142 of the Amended Complaint.

143.    Defendants did not exercise reasonable care in obtaining or communicating the information to Plaintiffs.

**ANSWER**:    Defendants deny the allegations contained in paragraph 143 of the Amended Complaint.

144.    Plaintiffs justifiably relied on the information that Defendants provided to them.

**ANSWER**:    Defendants deny the allegations contained in paragraph 144 of the Amended Complaint.

145.    Plaintiffs suffered damages in an amount to be determined at trial as a result of their justifiable reliance on Defendants' false representations.

**ANSWER**: Defendants deny the allegations contained in paragraph 145 of the Amended Complaint.

To the extent the foregoing allegation of the Amended Complaint have not been admitted or denied, they are denied.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs demands the following relief:

1.     That the Court award Plaintiffs compensatory, special, and consequential damages in an amount to be established at trial;

2.     That the Court award Plaintiffs punitive damages in an amount to be established at trial due to Defendants' intentional and outrageous conduct;

3.     That the Court award Plaintiffs their attorneys' fees and costs incurred in this action;

4.     For such other and further relief as the Court deems just and proper.

**ANSWER:** This is a prayer of relief to which no response is required. To the extent a response is required, Defendants deny that Plaintiffs are entitled to this or any other relief.

## DEFENSES

Without assuming any burden that they would not otherwise bear, Defendants assert the following defenses to Plaintiffs' Amended Complaint:

### First Defense

Plaintiffs are barred from pursuing their claims in the Eastern District of Tennessee because this Court lacks subject matter jurisdiction, as there is not complete diversity among the parties, and the Amended Complaint, and each purported claim contained therein, with respect to the Defendants, should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## Second Defense

Plaintiffs are barred from pursuing claims in the Eastern District of Tennessee because venue is improper, and the Amended Complaint, and each purported claim contained therein, should be dismissed pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure or, in the alternative, transferred to the proper venue.

## Third Defense

The Amended Complaint fails to state a claim against Defendants upon which relief may be granted, and the Amended Complaint, and each purported claim contained therein, should be dismissed pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## Fourth Defense

The Plaintiffs' claims are barred by their own fraud and/or the doctrine of unclean hands based on, among other things, the (i) Plaintiffs' overstatement of the operating experience and performance of DMM and AMS; (ii) Plaintiffs' failure to provide satisfactory due diligence; (iii) Plaintiffs' failure to disclose Zaccanelli's continued involvement in the proposed transaction; (iv) Plaintiffs' concealment of DMM's acquisition of Newcare and GCG and the adverse effect such acquisitions would have on DMM's cost structure; and (v) Plaintiffs' failure to timely disclose that DMM was "in an insolvent position, and in a very precarious and serious situation with Medicare," when the Plaintiffs knew such information was inaccurate or material, and that the Defendants would and did reasonably rely on such misrepresentations and omissions to their detriment.

## Fifth Defense

Plaintiffs' claims are barred to the extent that they were required to be pled with sufficient particularity under applicable law, and Plaintiffs failed to do so.

## Sixth Defense

Plaintiffs have suffered no damages, or no damages for which Defendants can be held liable.

## Seventh Defense

Whatever damages Plaintiff may have suffered, if any, were the sole and proximate result of the acts or omissions of a party or person other than Defendants.

## Eighth Defense

Plaintiffs are not entitled to receive punitive damages because Plaintiffs have not pled facts sufficient to support such an award.

## Ninth Defense

Plaintiff's claims are barred, in whole or in part, because Defendants are entitled to the benefit of all defenses and presumptions contained in, or arising from, any rule of law or statute whose substantive law controls the action.

## Tenth Defense

Any damages to Plaintiffs – which are denied – are limited by all applicable statutory and constitutional caps and restraints, including, but not limited to, the caps on punitive and compensatory damages contained in the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States.

## RESERVATION OF DEFENSES

Defendants hereby give notice that they intend to rely upon such other defenses as may become available or apparent during the course of investigation, discovery, or trial, and Defendants reserve the right to amend their Answer and Defenses to Plaintiffs' Amended Complaint to assert such other defenses to which they may be entitled under the applicable facts or law.

## THE PLATINUM GROUP USA AND THIRD FRIDAY FUND'S COUNTERCLAIM AGAINST COUNTERCLAIM DEFENDANTS DMM, THE FREYS, AND AZZAM

With the understanding that subject matter jurisdiction is at issue, and reserving all rights with respect to Plaintiffs' pending motion to enjoin the lawsuit filed by Third Friday Fund in Florida, as and for their counterclaim against DMM, Michael Frey, Natalie Frey, and Mohannad Azzam (collectively, the "Counterclaim Defendants"), The Platinum Group USA and Third Friday Fund state and allege as follows:

1.      Platinum Group USA, Inc. ("The Platinum Group USA") and the Third Friday Total Return Fund, L.P. ("Third Friday Fund") (collectively, the "Counterclaim Plaintiffs") assert this counterclaim pursuant to Fed. R. Civ. Proc. 13, 19, and 20.

2.      The Platinum Group USA is a corporation organized and existing under the laws of Florida with its principal place of business in Delray Beach, Florida.

3.      Third Friday Fund is a limited partnership organized and existing under the laws of Delaware with its principal place of business in Delray Beach, Florida.

4.      Diverse Medical Management, Inc. ("DMM") is a Tennessee corporation organized and existing under the laws of Tennessee with its principal place of business in McMinnville, Tennessee.

5.      Defendant Michael Frey is an adult resident of Tennessee and is the President and Chief Executive Officer of DMM.

6.      Defendant Natalie Frey is an adult resident of Tennessee and is Executive Vice President – Strategic Planning of DMM.

7.      Dr. Mohannad Azzam is an adult resident of Alabama and is the Chief Medical Director of DMM. Azzam is also the founder of Azzam Medical Services, LLC ("AMS").

8.      To the extent this Court finds it has jurisdiction over the Amended Complaint, this Court also has jurisdiction over the causes of action set forth in this Counterclaim, pursuant to 28 U.S.C. § 1332, as the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.

9.      This Court has personal jurisdiction over the Counterclaim-Defendants due to their purposeful availment of the privilege of acting in Tennessee and intentionally causing the consequences described below, as well as through initiating the Amended Complaint before this Court.

10.     To the extent this Court finds it has jurisdiction over the Amended Complaint, venue is proper pursuant to 28 U.S.C. §§ 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

11.     The Freys and Azzam are properly joined to this Counterclaim as Counterclaim Defendants because they, like DMM, are necessary parties and must be joined as parties in this action pursuant to Fed. R. Civ. Proc. 19(a) because the Counterclaim Defendants jointly participated in the wrongful actions, detailed below, that defrauded The Platinum Group USA and Third Friday Fund and there are common questions of fact or law that require their joinder. As a result, in the absence of the joinder of the Freys or Azzam, this Court "cannot accord complete relief among existing parties," which pursuant to Rule 19(a)(1)(A) is the basis for mandatory joinder of parties.

12.     In the alternative, this Court has wide discretion to add the Counterclaim Defendants pursuant to Fed. R. Civ. Proc. 20. Specifically, Rule 20(a)(2) holds that individuals "may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction,

occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."

**Fraudulent Inducement**

13.     During the diligence and negotiation of the potential acquisition of DMM by The Platinum Group USA, the Freys requested loans from Third Friday Fund in order to meet its payroll and other operational costs during this phase of Defendants' evaluation of a possible transaction with the Plaintiffs. In connection with the loan requests, the Freys and Azzam provided Third Friday Fund and The Platinum Group USA financial information and statements that purportedly supported the loan requests and information needed that purportedly addressed The Platinum Group USA's diligence inquiries with respect to the potential acquisition.

14.     Third Friday Fund agreed to make loans to DMM pursuant to the express terms of loan agreements entered into between Third Friday Fund and DMM. Third Friday Fund made the loans to DMM so that DMM could meet its payroll while the parties explored a potential investment in DMM by The Platinum Group USA.

15.     While it was anticipated that the loans would be repaid upon a completion of an acquisition of DMM, such an acquisition was not a condition of loan repayment, as evident in the loan agreements. Contrary to Plaintiffs' implication in the Amended Complaint, there is no mention in any of the loan agreements that completion of an investment in DMM by The Platinum Group USA is a condition of repayment. DMM and Third Friday Fund agreed that all of the amounts loaned would be repaid based on the express terms of the loans.

16.     Accordingly, between July 2018 and February 2019, Third Friday Fund loaned DMM at least $766,495 (collectively, "the Loan Agreements"), as detailed below:

| Date of Loan | Amount |
|:---:|:---:|
| July 30, 2018* | $100,000 |
| August 24, 2018* | $150,000 |
| September 10, 2018 | $3,500 |
| September 26, 2018* | $66,000 |
| October 10, 2018* | $49,000 |
| October 23, 2018* | $56,500 |
| November 8, 2018* | $57,000 |
| November 13, 2018 | $1,500 |
| November 20, 2018* | $49,000 |
| December 17, 2018* | $35,000 |
| December 20, 2018* | $32,000 |
| January 2, 2019* | $35,000 |
| January 16, 2019 | $35,000 |
| January 30, 2019 | $35,000 |
| February 1, 2019 | $20,000 |
| February 6, 2019 | $6,995 |
| February 13, 2019 | $35,000 |
| **TOTAL:** | **$766,495** |

17.     Most of the loans made by Third Friday Fund to DMM were evidenced by unsecured Loan Agreements; several loans were not memorialized in writing (the "Undocumented Loans") despite the parties' intention to memorialize them. The Loan Agreements denoted with an asterisk, above, are evidenced by unsecured Loan Agreements, attached as Exhibits A through J (the "Documented Loan Agreements").

18.     In each of the Documented Loan Agreements, Third Friday Fund agreed to lend a principal amount of money to DMM in exchange for an interest rate equal to 6%. *See*, *e.g.*, Exhibit A at ¶ 2; Exhibit B at ¶ 2; Exhibit C at ¶ 2; Exhibit D at ¶ 2; Exhibit E at ¶ 2; Exhibit F at ¶ 2; Exhibit G at ¶ 2; Exhibit H at ¶ 2; Exhibit I at ¶ 2; Exhibit J at ¶ 2.

19.     Similarly, the Undocumented Loans were to bear 6% interest.

20.     Each of the Documented Loan Agreements required DMM to make full repayment of the principal amount of the loan and any accrued but unpaid interest by no later than December

31, 2018. *See*, *e.g.*, Exhibit A at ¶ 3; Exhibit B at ¶ 3; Exhibit C at ¶ 3; Exhibit D at ¶ 3; Exhibit E at ¶ 3; Exhibit F at ¶ 3; Exhibit G at ¶ 3; Exhibit H at ¶ 3; Exhibit I at ¶ 3; Exhibit J at ¶ 3.

21.　　In each of the Documented Loan Agreements, DMM agreed that in the event of a failure to pay the principal or interest due, DMM would pay an additional 2% interest to Third Friday Fund. *See*, *e.g.*, Exhibit A at ¶ 7; Exhibit B at ¶ 7; Exhibit C at ¶ 7; Exhibit D at ¶ 7; Exhibit E at ¶ 7; Exhibit F at ¶ 7; Exhibit G at ¶ 7; Exhibit H at ¶ 7; Exhibit I at ¶ 7; Exhibit J at ¶ 7. The Undocumented Loans also provided for an additional 2% in default interest.

22.　　Because the potential acquisition of DMM by The Platinum Group USA was subject to satisfactory due diligence and other contingencies as of the Maturity Date, including financing, on or about January 2, 2019, the Freys requested that the parties extend the Maturity Date on ten of the Undocumented Loans (that had been made as of that date) and the Documented Loan Agreements to January 31, 2019. *See* Exhibit K.

23.　　Upon information and belief, on or about December 2018 or January 2019, DMM acquired Geriatric Consulting Group ("GCG") and its sister company that handles management issues, Newcare, and concealed such acquisitions from Third Friday Fund and The Platinum Group USA until on or about April 23, 2019 when they first disclosed it during an all-hands teleconference involving the parties and their counsel. These acquisitions significantly increased DMM's payroll.

24.　　During January and February 2019, Third Friday Fund continued to loan money to DMM, at the Freys' and Azzam's request – made without disclosing to Third Friday Fund and The Platinum Group USA that DMM had recently acquired Newcare and GCG – while The Platinum Group USA continued its diligence and worked toward closing the acquisition, as evidenced by additional Undocumented Loans.

25.     At the end of February 2019, Third Friday Fund stopped extending credit to DMM because the Freys and Azzam refused to provide The Platinum Group USA or Third Friday Fund with accurate financial due diligence materials or reasonable explanations why it was still operating at a loss and could not meet its payroll. The Freys and Azzam refused to provide, among other information or documentation, tax returns or other historical and proforma financial information for its business. In retrospect, this is not surprising because the Freys and Azzam were trying desperately to conceal DMM's acquisitions of Newcare and GCG while scheming to receive funding to cover DMM's operating costs until the transaction with The Platinum Group USA closed.

26.     There were yet further negative developments. On March 28, 2019, in a text to Michael Lewitt, James Biden, and Amer Rustom (who, collectively, worked on behalf of the investor group regarding the potential acquisition of DMM), Frey and Azzam admitted that DMM was "in an insolvent position, and in a very precarious and serious situation with Medicare," threatened specious litigation, and announced the renewed involvement of Frank Zaccanelli, which that Frey and Azzam knew was categorically unacceptable to the potential investor group.

27.     The deal irreparably collapsed on April 23, 2019 after the Freys and Azzam disclosed for the first time to The Platinum Group USA and Third Friday Fund during a telephone call that DMM had entered a contract to purchase NewCare and GCG, in late 2018 or early 2019 without disclosing the terms of the transactions to The Platinum Group USA or Third Friday Fund. During that phone call, the Freys and Azzam, for the first time, disclosed that the NewCare/GCG acquisition would increase its monthly payroll by more than 300% beginning in late April 2019 (from $49,000/bi-monthly to $175,000/bi-monthly) and that the Freys and Azzam expected Third Friday Fund to loan DMM the funds to meet this new obligation on two days' notice.

28.     On April 25, 2019, Third Friday Fund sent a "Demand and Reservation of Rights" to DMM informing DMM of its default that resulted from DMM's "failure to pay any amount of the principal or interest due on the Loans within five Business Days of the Maturity Dates." *See* Exhibit L at 2.

29.     DMM defaulted pursuant to the terms of each of the Loan Agreements by, among other things, failing to make any required interest or principal payments.

30.     As Third Friday Fund informed DMM in the Demand and Reservation of Rights, "[Third Friday] is declaring all liabilities and obligations of [DMM] under the Accommodations immediately due and payable, including pursuant to the respective Sections 3 and 8(a) of the Loan Agreements." *Id*.

31.     DMM has not made any payments of interest or principal since receipt of the Demand and Reservation of Rights nor has it made any effort to contact Third Friday Fund to discuss the loans.

32.     The Freys and Azzam made numerous false statements concerning materials facts, or concealed material facts, including but not limited to (i) overstating the extent and strength of DMM's business operations; (ii) misrepresenting Frank Zaccanelli's involvement in the transaction; (iii) failing to provide satisfactory due diligence relating to the cost structure and operating losses of DMM; and (iv) concealing the acquisition of Newcare and GCG and the operational expenses associated with such transactions.

33.     The Freys and Azzam knew that such statements were false (or that such omissions were material) or had utter disregard for the truth of such statement.

34.     The Freys and Azzam made such statements or concealed material information with the intent to induce Third Friday Fund's reliance on the statements and/or omissions.

35.     The Freys and Azzam made such statement or concealed material information with the intent to induce The Platinum Group USA's reliance on the statements and/or omissions.

36.     Third Friday Fund reasonably relied on such statements and/or omissions.

37.     Third Friday Fund has been harmed in an amount of not less than $766,495, plus interest, attorneys' fees and other costs, in an amount to be proved at trial.

38.     The Platinum Group USA reasonably relied on such statement and/or omissions.

39.     The Platinum Group USA has been harmed in amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendants and Counterclaim Plaintiffs respectfully request that the Court grant the following relief:

1.     Dismiss Plaintiffs' Amended Complaint with prejudice and enter judgment in Defendants' favor against Plaintiffs and tax costs to Plaintiffs;

2.     Award Counterclaim Plaintiffs compensatory damages in an amount not less than $766,495, plus interest, attorneys' fees and other costs, for harm they suffered as alleged in the Counterclaim;

3.     Award Counterclaim Plaintiffs punitive damages in an amount to be established at trial due to DMS's, the Freys' and Azzam's fraudulent conduct;

4.     Award Counterclaim Plaintiffs their attorneys' fees and costs incurred in this action;

5.     Authorize the service of process to Counterclaim Defendants Michael Frey, Natalie Frey, and Mohannad Azzam; and

6.     Grant such other and further relief as the Court deems proper, equitable, and just.

Dated August 26, 2019                    Respectfully submitted,

                                         *Defendants Platinum Group USA, Inc., Amer
                                         Rustom; The Third Friday Total Return Fund, L.P.,
                                         Michael Lewitt, and James B. Biden and
                                         Counterclaim Plaintiffs The Platinum Group USA,
                                         Inc. and Third Friday Total Return Fund, L.P.*

                                         By: /s/ Scott Hickman
                                         One of their attorneys

                                         **SHERRARD ROE VOIGT HARBISON, PLC**
                                         J. Scott Hickman (BPR No. 017407)
                                         L.Webb Campbell II (BPR No. 011238) (Admitted
                                         *Pro Hac Vice*)
                                         150 3rd Ave. South, Suite 1100
                                         Nashville, TN 37201
                                         T: (615) 742-4200
                                         F: (615) 742-4539
                                         SHickman@srvhlaw.com
                                         WCampbell@srvhlaw.com

                                         --and—

                                         **FAEGRE BAKER DANIELS LLP**
                                         George R. Mesires (*Pro Hac Vice* pending)
                                         Yasmin N. Best (*Pro Hac Vice* pending)
                                         Joan A. Akalaonu (*Pro Hac Vice* pending)
                                         311 S. Wacker Drive, Suite 4300
                                         Chicago, IL 60606
                                         T: (312) 212 6500
                                         F: (312) 212 6501
                                         George.Mesires@faegreBD.com
                                         Yasmin.Best@faegreBD.com
                                         Joan.Akalaonu@faegreBD.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing **DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFFS' FIRST AMENDED COMPLAINT AND COUNTERCLAIM PLAINTIFFS' COMPLAINT AGAINST COUNTERCLAIM DEFENDANTS** was served upon Plaintiffs' counsel by the Court's CM/ECF filing system on the 26th day of August, 2019.

> Robert A. Peal
> Mark W. Lenihan
> **SIMS|FUNK, PLC**
> 3322 West End Avenue, Suite #200
> Nashville, TN 37203
> (615) 292-9335
> rpeal@simsfunk.com
> mlenihan@simsfunk.com

and via regular mail, postage prepaid to:

> Grant White
> 4337 Sea Grape Drive
> Lauderdale-By-The-Sea, FL 33308

> */s/  Scott Hickman*
> Attorney for Defendants Platinum Group USA, Inc. Amer Rustom, The Third Friday Total Return Fund, L.P., Michael Lewitt, James B. Biden and Counterclaim Plaintiffs The Platinum Group USA, Inc. and Third Friday Total Return Fund, L.P.